RIFE *v.* MOTE.

4-7891                                         197 S. W. 2d 277

Opinion delivered November 11, 1946.

630

*Lamar Williamson* and *Rose, Loughborough, Dobyns & House,* for appellant.

*Emil Corenbleth, John Baxter* and *E. E. Hopson,* for appellee.

MINOR W. MILLWEE, Justice. This is a suit between contractors growing out of the construction for the Federal government of the Japanese Relocation Center at Jerome, Arkansas. Appellant, A. J. Rife, operates the A. J. Rife Construction Company of Dallas, Texas, which is a partnership composed of A. J. Rife and

Stephen Chandler, trustee for Rife's two daughters. F. A. Mote is also a building contractor residing in Dallas, Texas.

On August 19, 1942, the parties executed the following contract:

"Whereas, F. A. Mote has been instrumental in securing for the partnership known as A. J. Rife Construction Company and Associates, a certain contract for the construction of the Japanese Relocation Center at Jerome, Arkansas, and,

"Whereas, A. J. Rife desires to compensate F. A. Mote for his services for securing this contract, therefore, mutually agreed as follows:

"F. A. Mote is to act as manager of the project, in the name of A. J. Rife Construction Company and Associates; devoting to that work his full time and effort, and bringing to bear all his best knowledge and judgment as conscientiously as though the contract were his own; bearing in mind, however, that all actions taken by him must be such as to reflect credit on the A. J. Rife Construction Company.

"A. J. Rife Construction Company agrees to pay to F. A. Mote as compensation for his management services, twenty-five (25) per cent of the net profits which may accrue on this project, as computed at the close of the project, but, subject to any change in contract price which may be made by the government as the result of the renegotiation clause in the contract, and

"Provided further, that F. A. Mote has carried the job through from beginning to completion in a manner satisfactory to the engineers and to A. J. Rife;

"It is definitely understood and agreed that A. J. Rife will be the sole judge as to the efficiency with which F. A. Mote is carrying on his part of the work, and Mr. Rife reserves the right to, at any time, remove F. A. Mote and/or any of his associates from the project, without prejudice, and without the right of recovery of damages by the said F. A. Mote, or any of his associates,

except that should the management services of F. A. Mote be terminated prior to the completion of the contract, a determination will be made at that date of the value of the services which have been rendered by Mr. Mote to that date, and those services will be paid for by the A. J. Rife Construction Company. This determination will be based on the percentage of work which has been accomplished to the date of cancellation of this contract.

"F. A. Mote will be allowed a drawing account of one hundred ($100) dollars per week, during the progress of construction, which sum is to be charged against his percentage of profits and to be deducted from that percentage before final payment is made by A. J. Rife Construction Company.

"It is particularly understood that this contract in no sense constitutes a partnership agreement, and no action is to be taken at any time by F. A. Mote which would indicate to anyone that a partnership existed. This is strictly a management agreement with a participation in the profits, which may be terminated at any time by A. J. Rife should he become dissatisfied in any manner with the services being rendered by the said F. A. Mote.

"A. J. RIFE CONSTRUCTION COMPANY,
"By (signed) A. J. Rife,
"(signed) F. A. Mote."

Prior to execution of the foregoing contract, Rife and Mote had entered into a verbal agreement whereby the latter would seek out and make bids on some of the many government construction contracts which were being let in connection with the prosecution of the war. The record reflects that both men were experienced contractors, but Mote had been inactive for some time prior to 1942, while the Rife Construction Company was a going concern and had several large projects under construction.

Under the original arrangement, appellee Mote was to prepare estimates and bids at his own expense and

furnish a small amount of equipment. He was also to manage the job on any contracts that might be procured either in his name or the name of the parties jointly. Rife was to furnish most of the equipment and all finances, and profits were to be shared equally. Under this arrangement Mote submitted unsuccessful bids on two government projects at Stuttgart, Arkansas, and Rohwer, Arkansas. It was then decided to submit bids on the Jerome job and there is considerable dispute in the testimony as to the conditions under which this bid was made. According to the testimony on behalf of appellee the bid was to be made under the same partnership arrangement existing under the previous bids. The testimony on behalf of appellants tends to show that Rife was unwilling to bid on this job on the same basis, and that an oral agreement was made prior to submission of the bid embodying substantially the same terms as the contract signed on August 19, 1942.

The bid was made in the name of the Rife Construction Company and Associates with Mote listed as job manager. The contract was awarded on July 27, 1942, but was not formally executed until July 31, 1942. It called for the erection of several hundred buildings at a cost of approximately $3,500,000. On July 31, 1942, the date the contract was formally executed, Rife submitted a memorandum contract to Mote in the form of a letter which contained substantially the same provisions as the written contract of August 19, 1942. This letter purports to confirm a prior oral agreement between the parties and was retained unsigned by Mote until the formal contract was executed on August 19, 1942. The letter and the contract of August 19 were both prepared by the auditor of the Rife Construction Company. Appellee assumed the duties of manager as soon as the contract was let and remained in that capacity until August 24, 1942, when he received a letter from Rife written August 22, 1942, discharging him.

Appellee filed this suit in chancery court on September 2, 1942. In the complaint as amended, appellee alleged that the contract of August 19, 1942, was secured

through duress, coercion, and fraud and that he was entitled to 50 per cent of all profits under a prior oral agreement between the parties. It was also alleged that in the event the court should determine the contract of August 19, 1942, to be binding, appellee should be awarded 25 per cent of the total profits unless it should be found that Rife had the right to discharge appellee, in which event it was asked that Mote be awarded 25 per cent of "the potential profits" existing as of the date of discharge.

Appellants answered admitting the execution of the contract of August 19, 1942, but denying other allegations of the complaint. They also filed a counterclaim for loss of $78,000 allegedly sustained on account of the negligent and inefficient management of the job by appellee.

On May 5, 1944, an order was entered by the chancellor, with the consent of the parties, appointing Hon. D. A. Bradham as special master to hear further testimony and state an account between the parties. This order was made after much of the testimony had been taken and contains the following provision: "When the master makes his final report to the court, either party to this action may file exceptions thereto and will not be bound by the findings of the master unless and until they have been approved by the court, and should an appeal be taken by either party to the Supreme Court of Arkansas, the case will there be tried *de novo* on the entire record as in all ordinary chancery cases."

After a thorough and painstaking consideration of the issues, the master filed his original and supplemental reports which contained exhaustive findings of fact and conclusions of law. The master found: (1) that the written contract of August 19, 1942, is valid; (2) that Rife had a legal right to discharge Mote on August 22, 1942, because of dissatisfaction, as contemplated by the contract; (3) that Mote was entitled to recover, in addition to certain pre-contract expense, $11,602.32 with 6% interest from the date of his discharge, which sum represented 32.525% of 25% of the profits which the master found to be $142,688; (4) that the counterclaim of appel-

lants should be denied; and (5) that appellants should pay all unpaid court costs, including the master's fee. Both parties filed their exceptions to the master's report.

The chancellor in his final decree adopted the report of the master except in the matter of costs, including the master's fee of $2,500, which the court directed should be divided equally between the parties. Both parties have appealed from this decree.

The record is voluminous. The transcript is in seven volumes and contains more than 1,500 pages of pleadings, testimony and reports. Many of the contentions originally urged by both parties seem to have been abandoned in this court. Appellants now insist that the master and trial court erred in: (1) the determination of the amount of Mote's compensation under the terms of the contract of August 19, 1942; and (2) striking certain bonus payments prorated by appellants to the Jerome job as overhead expense and thereby increasing the profits on the project by $1,907.50. The chief contentions of appellee on his cross-appeal are: (1) that he was wrongfully discharged, and (2) that appellant should pay all court costs, including the master's fee.

We shall first consider the question whether Rife had a legal right to discharge Mote on August 22, 1942, as this, in our opinion, presents the most vital question for determination. If this right existed at the time of Mote's discharge, the contract provides that a determination will then be made of the "value of the services which have been rendered by Mote to that date," and this determination "will be based on the percentage of work which has been accomplished to the date of cancellation of this contract." If, however, Mote was wrongfully discharged he is entitled to recover 25 per cent of the entire profits. It is earnestly insisted by appellee that appellants failed to show any valid reason for genuine dissatisfaction on the part of Rife with the managerial services of Mote after the execution of the contract of August 19, 1942, and that Mote's dismissal was the result of a conspiracy between Rife and other key men

on the project and for the purpose of enhancing the amount of Rife's profits under the contract.

The contract provides that Mote shall carry the job through to completion in a manner satisfactory to the government engineers and Rife, and that Rife shall be the sole judge of Mote's efficiency. The right to remove Mote at any time without prejudice and without the right of recovery of damages is also specifically reserved to Rife under the contract. It is further provided that Mote's services might be terminated at any time by Rife should he become dissatisfied in any manner with Mote's services.

The applicable rule is stated in 35 Am. Jur., § 28, pp. 463-4 as follows: "It is generally conceded that a contract by which one agrees to employ another as long as the services are 'satisfactory,' or which is otherwise expressed to be conditional on the satisfactory character of the services rendered, gives the employer the right to terminate the contract and discharge the employee whenever he, the employer, acting in good faith, is actually dissatisfied with the employee's work. . . . However, while it is not essential to the existence of the right to discharge the employee that the employer have any real or substantial ground for dissatisfaction, yet he must act honestly and in good faith. His dissatisfaction, to justify the discharge, must be real and not pretended; it must not be capricious or mercenary or the result of a dishonest design to be dissatisfied in any event. If he feigns dissatisfaction and dismisses the employee, the discharge is wrongful." In an annotation on the question in 6 A. L. R. 1497, it is said: "There are many cases supporting the rule that where a contract of employment is conditional on the satisfactory character of the services rendered, the employer has the right to discharge the employee if the former is actually dissatisfied with the work, irrespective of whether there is reasonable ground for such dissatisfaction, and the jury cannot inquire into the reasonableness of such dissatisfaction, provided it is genuine, and not set up in

bad faith merely to conceal some other insufficient excuse.''

Appellee cites the case of *Zitlin* v. *Max Heit Dress Corp.*, 151 Misc. 241, 271 N. Y. Supp. 275, in support of his argument that the burden was upon appellant to show that he was honestly dissatisfied with the services of appellee. In that case the court said: ''Upon proof of a valid contract and discharge, the burden is undoubtedly on the defendant of coming forward with evidence that the employee was discharged because of dissatisfaction, and it is true that such dissatisfaction must be genuine; but the burden of proof on the whole case is on the plaintiff, and he must show that the dissatisfaction was not genuine. The state of the employer's mind is a fact to be ascertained by the jury on the evidence introduced The employer's denial of satisfaction would not be conclusive. The state of a man's mind is as much a fact as the state of his digestion.''

In passing on the question whether Rife acted in good faith and was genuinely dissatisfied with Mote's services at the time he was discharged, the special master carefully analyzed and weighed the huge volume of testimony on this issue in the light of the above rules. It would unduly prolong this opinion to attempt to set out this testimony in detail. It must suffice to say that there was much evidence from the other three key men on the job, Maddox, Fain and Daniels, as well as the government engineers, critical of Mote's management of the project prior to execution of the written contract on August 19, 1942. In response to these complaints Rife visited the project and assisted Mote in ironing out the managerial problems immediately prior to the execution of the August 19 contract. Rife then returned to Dallas, Texas. On August 20 the complaints were renewed and the key men notified Rife of continued acts of mismanagement on the part of Mote. Rife ordered Mote to come to Dallas and when it was ascertained that Mote failed to promptly comply with this request, the letter of discharge of August 22, 1942, was written by Rife. It is true, as insisted by appellee, that Rife had

no right to discharge Mote for acts of mismanagement committed prior to August, 19, 1942. We agree with the master, however, that he had a right to consider occurrences prior to August 19 in determining the reasonableness of Rife's reaction to events transpiring in the three-day interim between the date of the contract and the time of Mote's dismissal.

The master and trial court ruled against appellee's contention that there was a conspiracy to discharge Mote and thereby increase Rife's profits. The master summarized the testimony on this issue in a finding as follows: "The great burden of the proof is to the effect that Mr. Mote had fallen down as a manager prior to August 19 and if Rife had discharged him at that time, the probability is Mr. Mote would have been in a worse condition, in so far as the proof is concerned, than being discharged under the written contract. Mr. Mote's evidence is to the effect that after August 19, he gave no cause for dissatisfaction. He implies that Maddox, Fain and Daniels conspired against him, to have him removed. One theory being that Maddox wanted his job, another being that Fain did not like him and wanted to get him off of the job. However, Daniels seems to have been the moving cause and there is no connection between what Daniels says he did and the attitude of Maddox or Fain. There is no proof that either Maddox or Fain influenced Daniels to do what he did. Then there is the suspicion that Rife insisted on Mote signing the contract so that he might immediately fire him. However, Rife's statement is to the contrary and his action seems to have been to the contrary; and since the burden of proof is upon one who alleges fraud or double dealing to prove it by clear, convincing and satisfactory evidence, we are not allowed to indulge a suspicion or presumption. However, there seems to be no way to reconcile the evidence of Mote on one part and Daniels, Fain and Maddox on the other as to what happened just after Rife left. There are three to one against Mote, and at least one of them, Daniels, is not

impeached; therefore, the master does not feel justified to indulge a suspicion."

After reviewing all the evidence on Rife's right to discharge Mote, the master concluded as follows:

"The master feels that Mr. Rife has discharged the burden resting upon him to show that he was sincerely dissatisfied at the time of the discharge. The master also feels that Mr. Mote has not discharged the burden resting upon him to show by a preponderance of the evidence, on the whole case, either that he was discharged by reason of fraudulent design or overreaching, or that Rife was not sincere in his expression of dissatisfaction in discharging Mote. For that reason, the master must hold that Mr. Rife had the right, at the time of the discharge, to discharge Mr. Mote." This conclusion was approved by the trial court and we are unable to say that it is against the preponderance of the evidence.

The chief contention of appellants is that there was error in the determination of the amount of Mote's compensation under the terms of his contract with appellants. It is argued that the formula used by the master in arriving at Mote's compensation is fantastic and that, in applying it, the master ignored the language of the contract which provides that the determination of the value of Mote's services should be based on "the percentage of work which has been accomplished" at the date of discharge. The progress report of the project engineer, Roy Earnest, showed construction 5.8 per cent complete at the time Mote was discharged. This percentage, according to the testimony, represents actual construction completed and in place and forms the basis upon which the government will make payments to the contractor as the work progresses. Appellants insist that this percentage of 5.8 per cent represents the sole basis for computation of Mote's compensation under the contract which would amount to one-fourth of 5.8 per cent of the net profits, or $2,068.98. The master rejected this contention and his report contains the following finding, in part, on this issue:

"It is clear to the master that the manager of a job has to do a lot of work before there is ever any construction at all. Whether they started this work on July 27, August 4, or August 6, Mr. Mote and his staff had a lot of work to do before that time and did a lot of work. If they had not, they would not have been ready or able to begin construction on August 6, so that a graph, or progress estimate for government pay, or upon which the government might make an installment payment, of 5.8 per cent on August 23.

"If there were some way to evaluate these daily progress reports whereby to have given the managerial staff any consideration for work accomplished in the managerial end of the job, and which was not tied in with an estimate of construction in place, or completed, which means at least some concrete was poured, then this percentage might be considered the same as work accomplished on the contract. In using the words 'Work Accomplished' the only legal or equitable meaning that could be placed upon words like that in hiring a manager for a building job would be the whole work accomplished in completing construction, the managerial work as well as the construction work."

We agree with the master's interpretation of the contract as approved by the trial court holding that the percentage of the work "accomplished" on the date of discharge means the percentage of managerial work accomplished. As pointed out by the master, if Mote had been discharged on August 6 he would then have been entitled to nothing under appellants' contention because there was no actual construction in place on that date. This would be true in spite of the fact that a good portion of the managerial duties had already been performed on August 6, 1942.

The master in devising the formula for computing the amount of compensation due Mote divided the managerial functions into four classifications, based on the evidence as follows: (1) laying out the operation; (2) perfecting the organization; (3) awarding contracts and

subcontracts for materials and jobs; and (4) job management. This formula is set out in the footnote.* While the formula may be complicated, in our opinion it furnishes a fair and reasonable criterion for arriving at a method of computing the value of Mote's services and one that is equitable and just to both parties under the testimony.

In determining the amount of net profits on the Jerome job, appellants charged this project with

* "The evidence fixes with reasonable certainty that there are two big jobs for a manager. Certain definite tasks that go with every job, and then what is termed 'over all' or 'job' management. The evidence makes it reasonably certain that the major portion of these management functions, (b) Perfecting the organization; (c) Awarding contracts; and (d) Getting out orders and getting materials delivered, had been performed before the discharge. As to (d) 'Job Management,' but a slight portion of that had been performed. Assigning to (a), (b), (c), and (d) 50 per cent of the managerial job and giving one-fourth of the 50 per cent, or 12½ per cent, to each; (a) Laying out the job is shown to have been 12 per cent complete. On the showing that this function (a) is 12½ per cent of the management job, we have 12 per cent of 12½ per cent, or 1.5 per cent of the whole task of laying out the operation performed by the date of the discharge. Giving to the other three special functions (b), (c), and (d) their *pro rata* per cent or 12½ per cent each, or 37½ per cent of the managerial job, the evidence shows these three functions to have been completed in a variable degree, and averaging the three, the reasonable inference from the evidence indicates with reasonable certainty that an average of 75 per cent of each of these tasks had been performed. 75 per cent of 37½ per cent would be 28.125 per cent, and if we add the 1.5 per cent of completion of laying out the operation to this 28.125 per cent, we have 29.625 per cent of this portion of the managerial job completed. When it comes to getting the proper per cent of the other 50 per cent of the management job, or 'job management,' completed before the discharge, we have to make a closer scrutiny of the inferences arising out of the evidence. Evidently, we cannot give credit for any effort expended in laying out the operation or contacting and contracting for materials and jobs, or in getting out orders and contracts and seeing to the delivery of materials, for those efforts have already been accounted for. Here is where we fall back on the 5.8 per cent of work accomplished, because that is where 'job management,' as distinguished from these other functions, comes in. Taking 50 per cent of this 5.8 per cent, we have 2.9 per cent of the 'job management' performed. Then, adding this 2.9 per cent to the 29.625 per cent, we have 32.525 per cent of the managerial work accomplished or completed at the time of the discharge. This 32.525 per cent is to be applied to the 25 per cent in which Mr. Mote would share. By applying this per cent to one-fourth of the profits, or taking 25 per cent of this 32.525 per cent, we arrive at Mr. Mote's share of the profits, computed upon the elements entering into the management job, and for which account should be made, according to the argument of plaintiff's attorneys as applied by the master. Figured thus, 32.525 per cent of 25 per cent is 8.13125 per cent; the per cent of the entire profits to which Mr. Mote would be entitled under the holding of the master, or the sum of $11,602.32."

$18,345.93 of their total overhead expense of $73,533.73 for the calendar year of 1942. Included in the "office payroll" item of $29,096.21 was the sum of $7,646 representing bonuses paid to only two of appellants' office employees in the month of December, 1942. The master struck the amount of these bonuses prorated to the Jerome job from the account thereby increasing the amount of net profits in the sum of $1,907.50. In his finding on this issue the master said: "The master holds that these bonuses are not properly chargeable against Mote's interest in the profits. Deducting $7,646 from the $9,927.39, the December payroll, leaves $2,281.39 as the December payroll. It was upon Mr. Rife to justify all of these charges. He justified them, or Mr. Koepcke did for him, by saying, 'That is the method pursued by contractors in this kind of business.' In making that statement he had no reference to contractors doing business like Mr. Rife did on other contracts where he managed them or hired a manager outright. But here he had a different deal with Mr. Mote. Mr. Mote was to get his pay out of the profits, and this job should have been kept separately." Appellants contend that the services under which the bonus payments were made could not be separated from the regular office payroll and that it is never done in actual business practice. Appellees, on the other hand, contend that it was error to charge any part of the $18,345.93 to the profits of the Jerome job. When due consideration is given to the nature of the management contract under which appellee was working for appellants, we think it would be inequitable to charge him with bonuses paid by appellants in December, 1942, and that the master and trial court correctly so held.

The master found that appellants should be held liable for payment of all unpaid court costs, including the master's fee. It seems that the reporting services and witness fees were paid by the respective parties as the trial progressed and these items were not included in the court costs. The trial court set aside this finding of the master and decreed that such costs should be

shared equally by the parties. On this issue the master found:

"Taking into consideration the fact that defendant discharged plaintiff under a contract which provided, if defendant did discharge plaintiff, even rightfully, technically, he would be due him a settlement; and yet, defendant made no offer of settlement; and taking into consideration that the plaintiff had to sue to get anything, and taking into consideration all of the equities involved, the master is of the opinion that the defendant should pay all of the unpaid costs of this suit, including the entire fee awarded to the master."

The conclusion reached by the master is equitable and fully supported by the record. Appellants not only failed to make a tender, but attempted to establish a counterclaim for $78,000 which was found to be without merit. We think the trial court abused its discretion in modifying the master's findings as to the court costs and master's fee.

It follows that decree of the chancery court will be modified to require appellants to pay the unpaid court costs, including the master's fee, as found by the special master. In all other respects the decree is af firmed.