**JOSEPH E. SEAGRAM & SONS, Inc. et al. v. BYNUM et al.**

**BYNUM et al. v. JOSEPH E. SEAGRAM & SONS, Inc. et al.**

Nos. 14213, 14214.

United States Court of Appeals
Eighth Circuit.

Aug. 23, 1951.

Rehearing Denied Sept. 10, 1951.

Shields M. Goodwin, Little Rock, Ark., for appellants Joseph E. Seagrams & Sons Inc.

Longstreet Heiskell, Memphis, Tenn. and DuVal L. Purkins, Warren, Ark. (John Baxter, Dermott, Ark., on the briefs), for appellees Bynum et al.

Before GARDNER, Chief Judge, and THOMAS and JOHNSEN, Circuit Judges.

THOMAS, Circuit Judge.

The appellees in No. 14,213, appellants in No. 14,214, hereinafter referred to as the Bynums, brought suit in the district court against Joseph E. Seagram & Sons, Inc., and one of its affiliates, hereinafter referred to as Seagram, for specific perform-ance of a contract of lease conveying a stave and heading mill to the lessees for a period of two years from August 1, 1945 (afterwards extended through July 31, 1950), for damages and an accounting; for a decree requiring the mill to be op-erated .at its reasonable capacity for the entire term of the lease; for damages for the alleged breach and for an accounting under a contract for the manufacture of staves by a mill near Gleason, Tennessee; and for damages for an alleged breach of contracts of employment with three of the Bynums.

The lease of the plant at Dermott, Arkan-sas, provided for a fixed rental of $3,000 a month (afterwards reduced to $2,750 a month) and for "additional" rentals for staves and heading. produced during the month above a fixed minimum. The court granted judgment to the plaintiffs for such additional rentals accruing at the Dermott plant after May 31, 1947, and for other items in the amount of $173,201.77, with interest to April 5, 1950, in the amount of $22,549.46, or a total of $195,751.23, less credits in the amount of $88,752.92.

The court also found for the plaintiffs on their claim for additional rentals on the staves and heading produced or "to be manufactured from the Gleason tract" and on the price of red oak timber sold from the tract in the amount of $31,821.70, with interest to April 5, 1950, in the amount of $2,892.74, or a total of $34,714.44.

For the alleged breach of the contracts of employment of three of the Bynums judgment was entered against the defend-ants for the total amount of $34,818.58.

The court denied the Bynums' claim that Seagram should operate the Dermott plant to its reasonable capacity for the full five-year term of the lease.

In No. 14,213 Seagram appealed from the judgments against it, and in No. 14,214, the Bynums filed a cross appeal from the denial of their claim that the Dermott plant was required to be operated at its reasonable capacity to the end of the five-year term of the lease.

The opinion of the district court is re-ported in 89 F.Supp. 780.

The two appeals were consolidated for submission to this court, and they may be disposed of in one opinion.

## No. 14,213.

The leased plant at Dermott, Arkansas, was used for the manufacture of staves and heading for barrels. The term "bourbon staves" means standard staves for use in making whiskey barrels. "Oil staves" means all other staves 30 inches or more in length. A "set" of staves means a sufficient number (18 to 28) of finished staves to make a barrel, and a "set" of heading consists of one head for the top and one for the bottom of a barrel. A "matched set" means the staves and heading necessary to make a complete barrel.

Seagram's first contention is that the court erred in fixing the amount of the judgment for "additional" rentals and some other items in the amount of $195,751.23 for staves and heading manufactured at the Dermott plant after May 31, 1947. That plant was operated at capacity until June 27, 1947, after which date operations were curtailed, and the plant was finally closed on February 26, 1948, and it was not operated thereafter. Seagram contends that the correct amount due the plaintiffs for additional rentals and other items is only $39,145.88.

As observed, supra, the rentals reserved under the lease consisted of two elements, a fixed rental of $3,000 a month until June 28, 1946, and $2,750 a month thereafter until the end of the term. The fixed rentals were paid until the end of the term and are not in dispute.

The formula for computing the "additional" rentals provided in the lease is as follows:

"In addition to the fixed rental * * * above provided, the Lessee agrees to pay to the Lessors the following amounts:

"1. A sum equal to twenty per centum (20%) of the market price of all oil staves which during the term of this lease are manufactured and made ready for shipment at said plant.

"2. Sums equal to the following percentages of the market price of all bourbon staves which during each twelve months of the term of this lease are manufactured and made ready for shipment at said plant:

"a. On the first 10,000 sets of bourbon staves, fifteen per centum (15%) of the market price;

"b. On all sets of bourbon staves between 10,000 and 20,000, twenty per centum (20%) of the market price;

"c. On all sets of bourbon staves between 20,000 and 30,000 twenty-five per centum (25%) of the market price;

"d. On all sets of bourbon staves between 30,000 and 40,000 thirty per centum (30%) of the market price;

"e. On all sets of bourbon staves above 40,000, thirty-five per centum (35%) of the market price;

"3. In the event the Lessee shall cause to be removed or shipped from the premises air dried and listed staves, such staves shall be included in determining the number of staves produced during each twelve months of the terms of this lease, and the Lessee shall pay to the Lessors sums equal to the percentages of the market price of such staves on the same basis and in the same manner as is provided in Paragraph 2 hereof.

"4. A sum equal to twenty per centum (20%) of the market price of all heading for barrels which, during the term of this lease, is manufactured and made ready for shipment at said plant."

Following these numbered paragraphs the lease reads:

"As used in Paragraphs 1, 2, 3 and 4 above, the term 'market price' shall be the applicable ceiling price at Dermott, Chicot County, Arkansas, so long as O. P. A. regulations establishing such prices shall remain in effect. If, however, the use of ceiling prices should be abolished prior to the termination of this lease, during that portion of the term of the lease in which no ceiling prices exist the market price for each month's output of manufactured staves and heading shall be determined by taking the average price in Louisville, Kentucky, for such month of staves and/or heading, of similar value, and deducting therefrom the cost of transportation of

such staves and heading in carload lots from Dermott, Arkansas, to Louisville, Kentucky."

When the lease was entered into the Price Control Act of January 30, 1942, was in effect and O.P.A. ceiling prices had been placed on all or most of the articles manufactured at the leased plant. Ceiling prices were abolished March 27, 1946, and it became necessary for the parties to construe and apply the terms of the lease. Their officers accordingly met in conference at Louisville, Kentucky, December 10, 1946. At this conference the parties agreed:

"The percentage rental provided for in said lease agreement, with respect to the number of sets of finished bourbon staves and finished bourbon heading, manufactured and made ready for shipment as defined in said lease agreement, after the elimination of OPA prices through May 31, 1947, shall be computed by applying the applicable percentage, set out in said agreement, to $15.00 per set for said described staves, and to $5.00 per set for said described heading; said values so used shall be net with no deductions to be made for cost of shipment; the said agreed values for said purpose of computing shall be effective only through May 31, 1947; * * *"

The parties could not agree upon the application of the contract rule, supra, to the price of staves and heading manufactured at Dermott after May 31, 1947; but it is agreed that during the period under consideration there was no current over-the-counter market for staves and heading at Louisville, Kentucky. Economic conditions had so changed after the end of the war in Europe in 1945 that the demand of the distillers for whiskey barrels was largely, but not entirely, supplied by their own mills. In this situation the court found:

"23. The fair average price at Louisville, Kentucky, for the monthly periods subsequent to May 31, 1947, after deducting cost of transportation in carload lots from Dermott, Arkansas, is $15.00 per set for finished bourbon staves; $5.00 per set for

finished bourbon heading; $2.80 per set for finished oil staves, and $1.15 per set for finished oil heading.

"24. The fair average price of air-dried and listed staves for the monthly period subsequent to May 31, 1947, after deducting cost of transportation in carload lots from Dermott, Arkansas, is $12.00 per set for bourbon staves and $4.00 per set for bourbon heading."

It will be observed that the prices fixed by the court following May 31, 1947, were the same prices agreed upon by the parties at their conference on December 10, 1946, for the period prior to May 31, 1947. Seagram contends that in so finding the court erred.

While there was no current over-the-counter market for staves and heading at Louisville, Kentucky, nor anywhere else in the United States, after May 31, 1947, there were occasional sales of staves and heading and also of whiskey barrels at Louisville and elsewhere. This situation was due to the fact that after the war in Europe ended conditions affecting the market changed radically. One reason for this was the difficulty of the distillers to procure grain for making whiskey due to the "Marshall Plan" which became effective and under which large quantities of grain were shipped to Europe. Another was the fact that during the war distillers had leased or purchased many stave and heading mills in which they manufactured a large part of their needed supply. Seagram had at one time 35 such mills.

In the circumstances Seagram contends that market price should be based upon the prices for which staves and heading actually sold in several instances; that from a compilation of those prices an average could be found.

On the other hand the Bynums contend that the "market price" should be computed upon the basis of the "average" cost of production in the mills owned and operated by Seagram.

In its opinion the trial court did not discuss findings 23 and 24, supra. Therefore, we do not know upon what considerations such findings are based.

In this situation it is our duty to determine the correct rule of law to be applied to the evidence and then to decide whether the court applied the rule to attain the result found.

■ Clearly the sales relied upon by Seagram, and the cost of production of staves and heading after May 31, 1947, until the mill ceased operation on February 26, 1948, relied upon by the Bynums, are proper elements to be considered, but they are not the only factors or influences to be considered. Neither the law of supply and demand nor the cost of production may be ignored. All the elements entering into the concept of fairness must also be considered, because they must be assumed to have been the guiding rule in the minds of both parties when the contract was written. Tureman v. Altman, Mo.Sup., 239 S.W.2d 304, 309. Here no fraud has been charged, but the lessors have sought to obtain the highest rentals possible while the lessees have sought with equal stubbornness to obtain as low rentals as possible.

■ It is the law that "The market price of a commodity is determined by the demand for the commodity with relation to the supply * * *." 55 C.J.S., Market, p. 787. But where no current market exists at the time the "market value" must be estimated. In Olson v. United States, 292 U.S. 246, at page 257, 54 S.Ct. 704, at page 709, 78 L.Ed. 1236, Mr. Justice Butler speaking for the court said:

"In respect of each item of property that [market] value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 124, 44 S.Ct. 471, 68 L.Ed. 934."

Judge Parker in United States ex rel. Tennessee Valley Authority v. Powelson, 4 Cir., 138 F.2d 343, 345, said: "* * * Market value is nothing but a hypothetical concept based upon what, in the opinion of those who know, a willing buyer would have to pay a willing seller of property in order to purchase it." See, also, Huber v. Moran, 8 Cir., 140 F.2d 823, 824; Shamrock Oil & Gas Corporation v. Coffee, 5 Cir., 140 F.2d 409.

■ We have read and considered all the relevant evidence upon this point together with the argument of counsel, and we conclude that in findings 23 and 24 the court overemphasized the element of cost of production and failed to consider other relevant facts. These are the same prices agreed upon by the parties December 10, 1946, to continue through May 31, 1947. The findings take no account of the changed economic conditions during that period, and particularly ignore the effect of the law of supply and demand existing after May 31, 1947. This impression is strengthened by the observation of the court at a hearing on certain motions March 1–2, 1949, that "If there is no market price there, then the law says it is what it costs to manufacture them [staves and heading]"; and again at a pretrial conference on March 30, 1949, the court said that "* * * if there is no market price, it would be the average value of cost that it would take to manufacture them."

Basing their arguments upon actual sales of staves and barrels during the period following May 31, 1947, appellants reached the conclusion that the fair market price of a set of finished bourbon staves was $10.70 and of a set of heading was $3.91. During this period finished bourbon barrels sold for prices ranging from $18 to $20 per barrel, and it was undisputed that the fair percentage of the total cost of a finished bourbon barrel attributable to the staves and heading required to make it is between 75 and 80 per cent. Upon the same theory appellants contend that for the same period the fair average value of air-dried and listed staves and heading was $9.90 and $2.75 per set respectively.

These estimates fail, we think, properly to consider the cost of production as an element of a fair price. They are too low.

A fair and equitable appraisal of all the factors properly to be considered will result in a price somewhere between the price contended for by the lessors and found by the court and the price contended for by the lessees.

After May 31, 1947, and prior to February 26, 1948, when operations were suspended, there were shipped from the Dermott plant 20,749 sets of finished bourbon staves, on which the court awarded additional rentals based on the price of $15 a set in the amount of $55,047. The appellants, basing their computation on the price of $10.70, contend that the correct rentals should be $39,266.86. During the same period 11,568 sets of finished or "circled" bourbon heading were shipped for which the court allowed rentals based upon the price of $5 a set in the amount of $11,568. Appellants, computing the rentals on the price of $3.91 per set, contend that the rentals should be only $9,046.18. In view of the conclusion we have reached above the court should reconsider the evidence and the factors affecting these prices and recompute the rentals accordingly.

■ Another item in dispute relates to additional rentals based on the sale of certain miscellaneous finished stock in storage at the plant in Dermott when operations finally ceased, which stock was later shipped and sold by Seagram on the open market. The total value of this stock was fixed by the Bynums at $15,401.77 and the total amount received by Seagram was $11,854.45. It was error to attribute a higher value to this stock than that which was received for it. The parties agree that the rate to be applied is 20%. The correct additional rental is, therefore, 20% of $11,854.45 or $2,370.89, instead of $3,081.35 as found by the court. The difference is $710.46 for which amount Seagram should be given credit on the judgment rendered.

■ At the time the Dermott mill suspended operations on February 26, 1948, large quantities of rough unfinished stock were on the yard consisting of bourbon staves, bourbon heading and oil staves and oil heading. It is agreed that 7401 sets of such rough or unfinished bourbon staves

and heading were shipped from the Dermott plant during the lease year ending May 31, 1948. At the time of such shipments such rough stock was selling for $9.90 per set. The Bynums contended that had the mill not suspended operations all of such stock could have been finished at the plant and that, therefore, additional rentals should have been estimated on the theory that such stock had been finished at the mill and shipped out prior to May 31, 1948, and that it should take the price of $15 per set. On the other hand Seagram contended that it should take the market price prevailing in 1948 when it was shipped. The court fixed the market price at $12 per set and allowed a rental of 20% thereon amounting to $17,762.40 which in effect allocated the shipments to the year beginning May 31, 1947. Had the rental been estimated on the basis of the year beginning May 31, 1948, when the stock was actually shipped the rental would have been estimated at 15% on the basis of $9.90 per set instead of 20% at $12 per set. We find no explanation of this either in the opinion or in the findings of the court. We have considered the arguments of counsel for the Bynums, but we are convinced that the court erred in this regard. The rental under the terms of the contract and the interpretation placed upon it by the parties in the years preceding 1948 are convincing that the 15% rental rate should be applied to the selling price. The judgment should be corrected accordingly. A similar error occurred in estimating the rental on the item of 2,265 sets of oil staves on the yard. The correct basis is 15% and not 20%.

■ The same situation exists in the record in reference to the computation of additional rentals for rough bourbon heading on the yard when operations at the plant terminated. It is agreed that there were at that time 30,114 sets of such heading which the court valued at $4 per set for the purpose of estimating rentals. Seagram contends that the correct value of all such heading was $2.75 per set. The court should also reconsider this finding, giving due consideration to the price for which such rough heading could be purchased at the time it was shipped and as the market

was thus influenced by the operation of the law of supply and demand.

■ Another item in dispute consisted of an estimated recovery of 10% of bourbon staves and heading from the rough oil staves and heading in the yard. Seagram contends that there was no evidence to support a finding that such recovery was possible. The evidence on this point was in conflict. The finding of the trial court cannot, therefore, be said to be clearly erroneous.

■ Finally, at the time of the trial in June, 1949, there remained unsold on the yard at the plant in Dermott the following quantities of rough oil staves and heading on which the court in accordance with the contentions of the Bynums allowed the following rentals:

| | |
|---|---|
| 23,170 sets of rough oil staves at $2.80 per set, value, $64,876.00, at 20% | $12,975.20 |
| 32,567 sets of white oak oil staves at $1.15, value, $37,452.05, at 20% | 7,490.41 |
| 3,031 sets of red oak oil heading at $1.15, value, $3,485.65, at 20% | 697.13 |
| 1,114 sets of ash and gum heading at $1.00, value, $1,114.00, at 20% | 222.80 |
| Total rental on rough oil staves and heading, | $21,385.54 |

Seagram's objection is that the court estimated the market price of all this rough stock at the price of finished stock, that is at $2.80 per set for rough bourbon staves and $1.15 and $1.00 for rough bourbon heading, whereas its market value in its rough unfinished condition did not exceed $4,938.65. On this basis the court's allowance was excessive in the amount of $16,446.87.

The Bynums contend that the court's computation is based upon and justified by the following provisions of the lease contract:

"In addition to the fixed rentals * * * the Lessee agrees to pay to the Lessors the following amounts:

"1. A sum equal to twenty percentum (20%) of the market price of all oil staves which during the term of this lease are manufactured and made ready for shipment at said plant * * *

* * * * * *

"4. A sum equal to twenty percentum (20%) of the market price of all heading for barrels which, during the term of this lease, is manufactured and made ready for shipment at said plant." And they point to the fact that the lease makes no provision for shipping rough oil staves and heading from the plant.

The fact stands out clearly, however, that these rough staves and heading were not "manufactured and made ready for shipment at said plant", and the finding of the court is inconsistent with its holding that the lessee was not required to operate the plant during the entire term of the lease. The undisputed evidence of Seagram that the market value of these staves and heading was no more than $4,938.65 should have been sustained, and the court erred in estimating their value on the basis of finished stock.

On the issue of the amount of Seagram's indebtedness to the Bynums as additional rentals upon stock produced at the Dermott plant after May 31, 1947, the judgment of the court is reversed and the case remanded with instructions to reconsider and recompute the amount thereof in accordance with the foregoing opinion.

The second question presented on the appeal is whether the lessees are liable to the lessors on account of additional rentals upon staves and heading produced by the lessees from timber near Gleason, Tennessee. The court entered judgment against the defendants on this issue in the amount of $34,714.44 as of April 5, 1950. The defendants contend that they are not liable to the plaintiffs in any amount on this claim.

The circumstances involved on this feature of the controversy may be briefly stated. In August, 1945, R. T. Wilkie, Seagram's agent, and W. W. Bynum, at Wilkie's request, met at Brownsville, Tennessee, to inspect a tract of timber. At By-

num's suggestion while there they inspected a tract owned by one Nants. Bynum claimed to be responsible for the discovery of the timber and claimed it as "his proposition." Seagram thereafter purchased the timber for $50,000, receiving a deed therefor November 26, 1945.

The alleged contract between the parties is contained in a letter written by Wilkie to W. W. Bynum dated August 20, 1945, which, so far as material, reads:

"With reference to the Tennessee timber in and about 15 or 20 miles of Gleason, Tennessee, while this is not covered by your contract, these things are true:

"1. That the contact was peculiarly yours.

"2. That the equipment other than motor transportation is being furnished from the leased property, and the supervision will be by the Bynum Brothers.

"Therefore, it is agreed that a similar contract applies to the Gleason property but the production will not be accumulative with the Dermott manufacture."

The "equipment" referred to in paragraph 2 consisted of a portable stave mill at the plant at Dermott but not in use.

The Bynums rely upon this letter as a statement of the terms of the contract; and W. W. Bynum testified that he orally accepted its terms on two occasions thereafter.

On the same day, August 20, 1945, Wilkie addressed a directive letter to Bynum reading: "You are directed to (1) Accept an option that we have on 500 acres of timber in Gleason, Tennessee, from Mr. Nanson [Nants]. This option expires 15 days from August 7, 1945. (2) Make arrangements to move stave equipment from Dermott and auto equipment from Louisville, or wherever it is available, to start operations not later than the 15th day of September. (3) Miss Voigt has the statement of the method of operations. (4) Steps should be taken to obtain an option on timber in the same locality covering a 15 or 20 mile radius."

The tract of timberland so acquired was wet and swampy, and there was no suitable place on it to locate the stave mill. There-

fore, Wilkie on September 26, 1945, obtained for Seagram a two-year lease on eight acres of land near the timber tract to provide a place on which to locate the portable stave mill to be brought from Dermott.

The testimony shows that the timber purchased could not be logged during the winter months because the ground was too wet. Seagram's witnesses testified that they frequently urged Bynum during the winter and spring of 1945–6 to move the mill to the location near Gleason, Tennessee, and to put it in operation as soon as possible; but Bynum testified that Seagram's officers prevented them from moving at all times, although they insisted on doing so in June, 1946, and thereafter.

In January, 1946, Seagram acquired a stave mill at Jackson, Tennessee, not far from the Gleason tract of timber.

The alleged breach of the contract consisted of a letter written by an officer of Seagram to Bynum on October 15, 1946, saying: "It is our plan to work the timber from the Nants tract, Gleason, Tennessee, at one of our stave mills in Western Tennessee or Kentucky. Supervision and all arrangements for cutting will be made by Mr. O. H. Huntley of our Nashville, Tennessee, office."

Thereafter the white oak timber from the Nants tract at Gleason, Tennessee, was manufactured into staves and heading at Jackson, Tennessee.

The trial court found that the Bynums had a contract with Seagram to cut and manufacture the timber and supervise the work on the Gleason tract upon the same terms as that at the leased mill at Dermott, except that the quantities were not to be accumulative; and that Seagram breached the contract; that "Seagram through its agent Huntley, cut and recovered from this tract of timber, staves and heading as follows:

"The prices applied are those applied at Dermott, Arkansas: * * *

"29,982 sets of bourbon heading at $4.00 per set, value $119,928.00, at 20%, rental $23,985.60

"48 sets bourbon staves at $15.00, $720, at 15%, rental 108.00

"42 sets oil staves at $2.85, $119.70, at 20%, rental 23.94

" 1,200 sets oil heading at $1.-15, $1,380.00 at 20% rental $276.00

"15,992 oil heads, sets, at $1.15, $18,790.80 at 20%, rental 3,678.16

$28,071.70

"On Sale of Red Oak Timber, $25,000 sale price, at 15% $3,750.00

"Total mfg. and sale $31,821.70

"Interest to April 5, 1950 2,892.74

"Total judgment $34,714.44"

Seagram contends that the court erred in its findings and conclusions in these particulars:

First, that the contract was void for want of mutuality because the Bynums neither as employees of Seagram nor as lessors were ever obligated to supervise the cutting of the Gleason timber; that the contract relied upon differed from the contract alleged in the complaint; that the Bynum brothers did nothing which they were not bound to do by their contracts of employment; and that they did not bind themselves to do anything more than they chose to do.

The evidence, however, warranted the court in finding that the contract was reduced to writing by Seagram's agent and accepted orally by the Bynums. Thus there were mutual promises imposing obligations upon both parties. This is sufficient to constitute a binding contract under the authority cited and relied upon by Seagram. Grayling Lumber Co. v. Hemingway, 124 Ark. 354, 187 S.W. 327.

The second contention is that even if valid, Seagram was warranted in rescinding the contract by reason of the lessor's abandonment and refusal to perform. Here, again, the evidence is in conflict. It is true that two witnesses testified that Seagram's officers urged the Bynums for 13 months to move the portable stave mill to the Gleason location and to begin operations there and they neglected and refused to do so, while only one witness, W. W. Bynum, testified to the contrary. But the veracity of the witnesses and the weight of the evidence were questions primarily for the trial court and this court cannot say that its finding is clearly erroneous. Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A.

Finally, Seagram contends that even if the Bynum claim were valid the amount allowed by the court was grossly excessive. The computation of the court and the record disclose that all this stock manufactured and that which could be manufactured at the Jackson plant from timber on the Gleason tract was in its rough and unfinished condition. As observed, supra, there is no provision in the Dermott lease for "additional" rentals on rough or unfinished heading when shipped from the mill in that condition. It is also shown that prior to the termination of operations at the Dermott plant the parties had estimated additional rentals on such stock at the market price at the time of shipment and sale. The period here under consideration is from June 1, 1947, to September, 1948. The court held that the price of rough bourbon heading at that time was $4 per set. The evidence, however, is that the market price at that time was only $2.25 per set. This price advanced during the winter of 1947–1948 to $2.75 per set. On the 28,182 sets of rough bourbon heading produced at the Jackson mill the rental should be $12,581.90, and on the 1800 sets which could have been produced thereafter at $2.75 per set the rental should be $990, or a total of $13,671.90 instead of $23,985.60 as found by the court. The court also computed the 48 sets of rough bourbon staves at $15 per set and 42 sets of rough oil staves at $2.85 per set, which were the prices for finished stock. This was error. There was no available equipment to produce finished stock at Gleason. The price for the rough bourbon staves should have been $8.10 per set at

20% rental, $58.32, and for the rough oil staves $2.00 per set, $84, rental, $16.80. The court also computed the 1200 and 15,-992 sets of rough oil heading at $1.15 per set, whereas it appears that the market value of such stock did not exceed 57 cents per set, or a rental value of $1,959.-89. These rentals should, therefore, be:

On 29,982 sets of rough bourbon heading, $13,671.90
48 sets of rough bourbon staves, 58.32
42 sets of rough oil staves, 16.80
17,192 sets of rough oil heading, 1,959.89

$15,706.91

There remains for consideration on this issue the holding of the court that Seagram should pay an additional rental of 15% of $25,000, or $3,750, based on the sale of the timber other than white oak on the Gleason tract.

Nothing in the pleadings, the lease, the contracts of employment, the contract to supervise the operation of the Gleason timber, the findings of fact, the opinion of the court, or the argument of counsel sustain this charge. Each one of the contracts of employment provided that "The said Bynum will use his best endeavor to negotiate the purchase of sufficient quantity of *white oak timber* to operate the aforesaid stave and heading mill * * *" (Emphasis supplied), and "additional" rentals by the terms of the lease were payable only on oil staves (and none others could be made of red oak) "manufactured and made ready for shipment at said plant * * *" Seagram had no use for red oak timber; and neither the lessors of the plant at Dermott nor the Bynums as employees had any contractual rights to require the red oak timber on the Gleason tract to be manufactured into staves. Neither had they any contractual right to additional rental based upon the sale of standing red oak timber on the Gleason tract no more than if it had been left standing on the premises. The court, therefore, erred in allowing $3,750 additional rental

on the sale of such timber not manufactured into staves "and made ready for shipment."

Appellants' third contention is that the court erred in finding and holding that Seagram was liable to the three Bynums for their salaries as employees of Seagram subsequent to their discharge on November 1, 1948.

The court held that there was no justification for the discharge of the Bynums; that they were wrongfully discharged; and that each of them was entitled to his salary from November 1, 1948, to July 31, 1950, the date of the termination of the employment contracts, less the amounts required to be deducted for social security and federal income taxes. Judgment was accordingly entered in favor of W. H. Bynum for $14,376.20; in favor of W. W. Bynum for $12,233.20; and in favor of W. B. Bynum, Jr., for $8,209.12, all of said judgments to bear interest at six per cent per annum from April 5, 1950.

The circumstances are as follows: On or about September 8, 1948, Seagram agreed to sell to the W. L. Bynum Company of Dermott, Arkansas, approximately 500,000 pieces of cull staves "as is, where is" on the mill site leased by Seagram, for the sum of $1,000. About September 20th when an employee of the W. L. Bynum Company came to pick up the rough culls delivery was refused by the appellees. Thereupon, on September 23d, Seagram wrote the three Bynum employees, directing them to permit W. L. Bynum to obtain the staves in accordance with the confirmation of sale. On September 29th, W. W. Bynum sent a letter to Seagram at Louisville, declining to deliver the rough cull staves as directed. The principal reasons for refusal to deliver as stated in his letter were:

1. That the staves were not jointly counted.

2. That the staves were not inspected to determine the percentage of 30 inch bourbon staves suitable for that purpose.

3. That no consideration had been given to percentages applicable to salvageable and workable by-products; and

4. That Mr. Wellnitz (a Seagram employee) had been informed on several occasions of "our business relations with the above party [W. L. Bynum]."

Following receipt of that letter from W. W. Bynum, in a letter from Seagram dated October 15, 1948, addressed to the three Bynums, W. W., W. H., and W. B., Jr., the contracts of employment were terminated, effective October 31, 1948, because of the refusal of said Bynums to follow the directive to deliver to W. L. Bynum Stave Company the "rough cull stave inventory" on the yard of the leased plant. In that letter Seagram stated:

"This refusal on your part to follow the aforementioned instruction constitutes a violation by you of your employment contracts with H. McKenna, Inc., [an affiliate of Seagram] in effect since August 1, 1945, and October 19, 1945, subsequently assumed by Julius Kessler Distilling Co., Inc., [another affiliate of Seagram]. By your refusal to carry out the aforementioned directive you have forfeited all of your rights under these employment contracts. Accordingly, this letter is notice to you that effective as of the close of business, October 31, 1948, your aforementioned contracts of employment are terminated."

Enclosed with the letter were salary checks paying the Bynums their salaries in full to October 31, 1948. Referring to the checks, the letter said, "Since we are terminating the employment contracts as of October 31, 1948, no further payments will be due you under them."

The three employment contracts are identical except as to the names of the employees and their salaries. Each contract, among other things, specifically provided that "The said Bynum shall work under the direction and instructions of the Employer, its officers, manager and agents, as a supervising operator for Employer of a certain stave and heading mill in Chicot County, Arkansas, operated by Employer."

In his opinion, supra, the trial court held that "Under such a contract the master does not have the right to terminate the contract and discharge the employee before the expiration of the time named in the contract, as a matter of whim or for trivial causes."

Nothing in the lease nor in the contracts of employment bound Seagram to work the cull staves at the Dermott mill for the benefit of the lessor or the employees or deprived Seagram of the right to sell such culls if it considered it advantageous to do so. Neither was the fact that the three Bynum employees were not on friendly terms with W. L. Bynum, their brother, a sufficient reason for them to disobey the directive to deliver the cull staves to their brother's company. In National Labor Relations Board v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486, 496, we had occasion to consider this question. We there said: "It was implied in the contract of hiring that these employees would do the work assigned to them in a careful and workmanlike manner; that they would * * * conduct themselves so as not to work injury to the employer's business; that they would serve faithfully and be regardful of the interests of the employer during the term of their service, and carefully discharge their duties to the extent reasonably required. 35 Am.Jur., p. 514. Any employee may, of course, be lawfully discharged for disobedience of the employer's directions, in breach of his contract."

The directive to deliver these cull staves was neither unreasonable nor trivial. The cull staves had been sold by Seagram for $1,000; and the refusal of its employees to deliver them constituted a breach of contract, rendering Seagram liable for such breach. A servant is bound to obey all reasonable orders of his employer; and his refusal to do so justifies his discharge. 35 Am.Jur., Master and Servant, § 36, p. 471; Development Co. of America v. King, 2 Cir., 161 F. 91, 24 L.R.A.,N.S., 812; S. Unterberger & Co. v. Wiley, 170 Ark. 976, 281 S.W. 899; Rife v. Mote, 210 Ark. 629, 197 S.W.2d 277; Von Heyne v. Tompkins, 89 Minn. 77, 93 N.W. 901, 5 L.R.A.,N.S., 524; Compania Constructora Bechtel-McCone, S.A. v. McDonald, 9 Cir., 157 F.2d 749; United Autographic Co. v. Wight, 8 Cir., 272 F. 545, 552.

The case of Griffin Grocery Co. v. Thaxton, 178 Ark. 736, 11 S.W.2d 473, cited and

relied upon by the court has no application here. In that case the employee was not only a servant, but a stockholder, director, vice-president, and manager of a branch house. To the extent of his holdings Thaxton was as interested in the company's business as Griffin, the president and owner of the controlling interest in the company. Here the Bynums had no financial interest in Seagram as stockholders. As lessors to Seagram of the mill property they were interested in the payment of rentals only. On the other hand their employment contracts, while entered into at the same time, were entirely distinct from and independent of the mill lease. These contracts were specific and unambiguous in their terms. The three Bynums as employees of the lessee were bound by their contracts of employment to obey the directives of their employer; and the record discloses no legal justification for their refusal to obey in the instance under consideration.

The judgment awarding W. H. Bynum, W. W. Bynum, and W. B. Bynum, Jr. their salaries subsequent to November 1, 1948, is erroneous.

On the direct appeal in No. 14,213 the judgment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

### No. 14,214.

 The Bynums, as lessors of the stave mill at Dermott, Arkansas, appeal " * * * from that part only of the Judgment entered on the 19th day of May, 1950, wherein it was adjudged that plaintiffs take nothing by reason of the failure of defendants to operate the leased plant at reasonable productive capacity from date of curtailment, June 27, 1947, and, from the date of its shutdown, February 26, 1948, to the end of the lease term, July 31, 1950."

Upon this cross appeal the Bynums urge four points: 1. That the court erred in entering the judgment referred to in the preceding paragraph; (2) That the court erred in admitting testimony as to the discussion referred to in the court's opinion when the parties and their attorneys met to amend the lease October 19, 1945;

3. That the court erred in striking paragraphs 8 and 9 of the complaint and in excluding the testimony offered in support thereof; and 4. The court erred in excluding from the testimony exhibits 10 and 11, being certain government publications.

The Bynums do not contend that the lease expressly provides that the lessee shall operate the plant at its reasonable capacity to the end of the term or at all. Their contention is that the lease and the contracts of employment with three of the lessors must be read together as different writings executed at the same time between the same parties and relating to the same subject matter and that so construed there is an implied covenant on the part of the lessee so to operate the mill at capacity to the end of the term.

The controversy on this cross appeal involves only the amount of the "additional" or percentage rentals provided for in the lease based upon the number of staves and heading produced in a lease year, that is, for each year beginning on August 1st. The "fixed" rentals were paid to the end of the term, and the salaries of the three Bynums employed by Seagram were paid until they were discharged for cause.

The first amendment to the lease under date of October 19, 1945, relieved Seagram from the obligation not to operate another plant within a radius of 100 miles of Dermott, Arkansas, as provided in the original lease; extended the term of the lease three years to July 31, 1950; and obligated Seagram and its affiliates not to divert any of its timber from the Dermott plant; to allocate to the Dermott plant one-third of its timber suitable for making tight cooperage within 100 miles of Dermott contracted after January 1, 1946, until the extended lease should terminate; and reduced the fixed monthly rental from $3,000 per month to $2,750 per month.

The three employment contracts were extended on the same date to July 31, 1950.

It is the lessors' contention that Seagram's obligation under the lease and employment contracts was to have operated the plant for the full term of the lease

at its reasonable capacity to produce further additional rentals in the amount of $481,181.75, or at least in the amount of $165,966.95. These sums are in addition to the fixed rentals of $167,750 and $205,014.02 additional rentals which were paid on stock produced prior to the closing of the mill in 1948.

Seagram's contention is that, subject only to the obligation imposed upon it by the allocation-of-timber provision of the amendment of October 19, 1945, it had full power to operate the mill or not, as it might determine, the Bynum's protection against the possibility of the non-operation of the plant consisting of the unconditional obligation to pay a fixed rental for the full five-year term.

The trial court determined this issue in favor of Seagram. The findings of fact declare:

"21. Neither the orignal lease nor the amendments thereto contained any express covenant obligating Seagram to operate the Dermott plant at its reasonable productive capacity or to any extent.

"22. Taking into consideration all of the facts and circumstances surrounding the making of the lease contract, and amendments thereto, and the conduct of the parties while operating under the contract the court cannot say that it was the intention of the parties at the time of making the contracts to operate the mill at capacity for the term of the lease or to any extent."

And the court concluded as a matter of law: "3. Seagram was not obligated to operate the mill to its reasonable productive capacity, or to any extent, other than to the extent necessary for the allocation-of-timber provision of the amendment of October 19, 1945."

To support their contention the Bynums point primarily to the additional percentage rentals provided for in the lease and the clauses in the employment contracts providing that each of the three Bynums was employed as a "supervising operator for employer" of the leased stave mill; that each Bynum was to devote his entire time to such employment and to use his best efforts to operate the mill to capacity.

This argument overlooks the fact that no provision of the lease provided that the Bynums must be employed to operate the plant. No requirement of the lease would have prevented Seagram from employing persons other than the three Bynums to supervise the operation of the plant. Further, each employment contract provided that "The said Bynum shall work [not under the direction of the lessors but] under the direction and instructions of employer, its officers, managers and agents, as a supervising operator for employer * * *."

■ The Bynums in support of their argument cite W. T. Rawleigh Co. v. Wilkes, 197 Ark. 6, 9, 121 S.W.2d 886, 888, where it is said: "The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance. 6 R.C.L. 850, 851."

Here, however, the parties were not the same. The lease was executed by all the owners of the leased property, whereas the three employees owned only 45% of the leased property. Further, the purpose of the contracts was different. One was a lease; the others were employment contracts. The latter contracts were in no way dependent upon the lease. Nothing in the employment contracts depended upon the ownership of the leased property. None of the parties contended that the discharge of the Bynums on November 1, 1948, in any way affected their respective rights under the lease. See Phillips Petroleum Co. v. Skinner, 140 Kan. 413, 36 P.2d 968, 969; Sinclair Refining Co. v. Stevens, 8 Cir., 123 F.2d 186, certiorari denied 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1203. It will be observed, also that the compensation of the Bynums as employees was not included in the rentals received. They were paid salaries personally and distinctly for their services as employees. Any one of them might have been discharged at any time for good cause.

The Bynums contend that additional or percentage rentals provided for in the lease obligated the lessee to operate the plant at capacity during the term of the lease. On this point the court in its opinion said: "* * * the monthly rental which was unconditionally enjoined upon Seagram, whether it operated the mill or not, was inserted in the lease as a substitute for a covenant to operate except to the extent required by the allocation-of-timber provisions of the Amendment of October 19, 1945." Further, it is clear that had Seagram been required to operate the plant at capacity during the term of the lease a fixed rental might easily have been agreed upon. A sliding scale of rentals in addition to a fixed rental would have been unnecessary. Or, assume that after the lease as written was executed necessary timber for operating the plant at capacity could not have been procured, could any one say that additional rentals should none-the-less be paid on the basis of capacity operation? We think the court correctly construed the lease in this regard. The expressed provisions of the lease alone must control. Industrial Products Mfg. Co. v. Jewett Lumber Co., 8 Cir., 185 F.2d 866, 869.

The appellant-lessors next complain that the court erred in the admission of certain evidence. On October 19, 1945, Mr. Galphin, an attorney for Seagram, and Mr. Nelson, an officer, met with the Bynums and their attorney, Mr. Williams, in the latter attorney's office in Memphis, Tennessee, for the purpose of negotiating the first amendment to the lease which had been executed in the preceding August. At the trial Mr. Galphin and Mr. Nelson testified: "During the course of the discussion the Bynums brought up the question whether we would operate the Dermott plant to the end of the lease, and I [Galphin] said we could not bind ourselves to operate. Mr. Williams remarked that there was nothing in the lease requiring the tenant to operate. I further remarked that so long as we bought timber in the area, part of it would be allocated to the Dermott plant on which they could operate. While we were in this discussion, one of

the Bynums [asked] if we would guarantee operating their plant as long as we operated the plant at Pine Bluff. I said we couldn't make any promises with everything so uncertain, such as grain restrictions by the government, our own needs, the fact that the Pine Bluff plant would be an owned plant and might have various reasons to operate without operating at Dermott. We might shut down the Pine Bluff plant without shutting down the Dermott plant. The fact that we were working on a plywood barrel might change our need for barrels, and the general uncertainty of what we might produce in our distilleries made such commitment impossible."

This testimony was admitted over the Bynums' objection that it was incompetent, but it was not denied. The argument is that such evidence is admissible only when necessary to show the construction which the parties have placed on an ambiguous contract; that the lease in this case is not ambiguous; and that the right to suspend operations under such a contract must be set out in the instrument itself to be available. As authority for this contention the case of Mayfair Operating Corporation v. Bessemer Properties, 150 Fla. 132, 7 So. 2d 342, 343, is cited, in which opinion it is said: "The nicety observed in constructing such leases in this Country would require that the right to suspend operating in the manner shown should be set out in the instrument to become available." Reference to the opinion in that case discloses that it involved a lease for a moving picture theatre, and that in addition to a fixed monthly rental the lessee agreed to pay 10% of the gross income in excess of $3,000 a year. But the lease also provided that the lessee should "use its best efforts to obtain and maintain the highest volume of business on the premises." There is no such provision in the lease here.

In Jenkins v. Rose's 5, 10 and 25¢ Stores, 213 N.C. 606, 197 S.E. 174, 175, the construction of a lease was involved. The lessee guaranteed a rental of $2,400 a year and agreed to pay as additional rentals 5% of any sales over $48,000 a year. The term of the lease was for four years.

For the first three years the store was operated the lessee paid the fixed rental and a substantial "additional" rental. The store was not operated on the leased premises the fourth year, and the lessee paid only the fixed rental of $2,400. The lessor sued for an "additional" rental for that year. The trial court awarded damages in the amount of $1,071.38. On appeal the Supreme Court reversed, saying the lessor had completely protected its interests by requiring a fixed minimum rental of $200 a month, and saying further: "Whether the defendant operated a store in the building or whether it operated one successfully was no concern of the plaintiffs unless and until there were sales made on the premises in excess of $48,000.-00 during the rental year. If the defendant operated at a loss it must continue to pay the $200.00 per month."

See, also, Asling v. McAllister-Fitzgerald Lumber Company, 120 Kan. 455, 244 P. 16, 46 A.L.R. 1127.

In the present case we do not think the lease is ambiguous. The court's decision on this point was right even though the testimony objected to as incompetent was not considered at all.

The Bynums next contend that the court erred in striking paragraphs 6 and 9 of the complaint. Paragraph 6 alleged that for many years prior to August 1, 1945, the date of the lease, the Bynum Cooperage Company operated the leased plant successfully and profitably; that it owned considerable timber; that its capital investment was $275,000; and that it paid its managing agents $9,000, $7,500 and $5,000 a year respectively. Paragraph 9 alleged that $3,000 rental per month, after taking into account taxes, insurance, depreciation and the loss of valuable timber rights is not sufficient to give lessors any return on their valuable property.

The court sustained a motion to strike these paragraphs, holding that both parties were precluded because the written agreement fixed the rental and that the value and earnings of the property were not in issue. Counsel say the theory of the court might be true except for the fact

that Seagram's emphasis was that the fixed monthly rental was inserted as the basic agreement of earnings anticipated by lessors. The court's theory is consistent, however, with the theory of the lessors at the time the lessee took the deposition of W. W. Bynum on February 26, 1949. Counsel for Seagram inquired and the witness testified to the cost of the plant and other matters relevant under paragraphs 6 and 9 of the complaint. At the conclusion of the direct examination counsel for Bynums moved to exclude all of the questions and answers of the witness, saying among other things: "The contract fixed the rental and that speaks for itself and the rights of the parties were concluded by that agreement. Whether or not a good or bad trade was made for either Seagram or Bynums is not a matter at issue." No argument of counsel could render the allegations of paragraphs 6 and 9 competent. The court did not err in striking them.

Finally the Bynums contend that the court erred in excluding from the testimony exhibits 10 and 11. Exhibit 10 was an authenticated government pamphlet published by the Department of Commerce entitled "December 1945 Industry Report." The paragraph of the pamphlet offered in evidence reads: "Tight and Slack Cooperage. Production of tight cooperage prewar was largely controlled by independent barrel manufacturers. With the close of the war, however, due to the difficulty whiskey distilleries were having in securing their requirements of new white oak bourbon barrels, a trend toward integration occurred in the distillery industry with the result that today over 90 per cent of all tight barrels, staves and heading produced is done in captive plants owned by distillery interests."

Exhibit 11 was entitled "Report of the Federal Trade Commission on the Merger Movement", published in 1948, from which an excerpt beginning at the bottom of page 63 and continuing through page 69 was offered in evidence, together with charts of Seagram's Distilleries, National Distillers, Schenley's and others.

22

These exhibits were excluded on the ground that they consisted of opinions of some one who was stating his views on the subject and that they were immaterial.

It is true, of course, that statements in official documents are admissible in evidence in court when material to the issue on trial. However, it is difficult to perceive the materiality or relevance of these documents on the question whether the lease contract required Seagram to operate the leased stave mill at capacity to the end of the term of the lease.

The court did not err in excluding exhibits 10 and 11.

In appeal No. 14,214, Bynum, et al. v. Seagram, et al., the judgment is affirmed.