ERNEST B. VON HEYNE v. THOMAS S. TOMPKINS.[1]

February 27, 1903.

Nos. 13,315—(263).

### Master and Servant—Disobedience.

Where the relation of master and servant exists between parties, certain duties are cast upon the servant, which he is bound to fulfil and discharge; and the principal one is that of obedience to all reasonable orders of the master, not inconsistent with the contract. Disobedience of reasonable orders justifies a rescission by the master of the contract of employment, and the peremptory discharge of the servant.

### Contract of Employment.

Where a contract for service is an entire one, and not severable, and a servant is lawfully discharged for disobedience of the reasonable orders of the master, he is not entitled to recover for his services.

### Justification for Discharge.

When the facts are undisputed, and amount to a legal justification for the discharge of a servant, it is the duty of the court to so charge the jury, and that the servant was properly discharged.

### Master's Reasons.

The motives which actuate a master in discharging a servant are wholly immaterial, for the act is justified if any legal ground therefor existed at the time; and it is also immaterial whether or not all of the grounds were known to the master when discharging the servant. Nor is it necessary for the master to assign a reason for the discharge, and, should he assign one, he is not bound by it; nor is he estopped to rely upon some other or different reason or cause, whether known to him at the time of the discharge or not.

### Evidence.

*Held*, in the case at bar, that from the testimony it conclusively appears that the plaintiff was unfaithful as a servant, and that he disregarded and disobeyed the reasonable orders of the defendant the master, and that his discharge by the latter was justified in law, and that the trial court should have so charged the jury.

Action in the district court for Ramsey county to recover from defendant $5,693.36 for services upon a contract of employment.

[1] Reported in 93 N. W. 901.

The case was tried before Kelly, J., and a jury, which rendered a verdict in favor of plaintiff for $4,026.44. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, provided plaintiff should consent to a reduction of the verdict to $2,026.44, defendant appealed. Reversed, and judgment ordered for defendant.

*Stiles W. Burr* and *Young & Lightner*, for appellant.

*Stevens, O'Brien, Cole & Albrecht*, for respondent.

COLLINS, J.

In the year 1900 the defendant, Tompkins, was the owner of a large and valuable stock farm near White Bear Lake, in this state. The swine, sheep, and poultry thereon were of the best varieties, and there was a herd of pure-bred Holstein-Friesian cattle. He employed Von Heyne, the plaintiff, to work for him on this farm. The parties entered into a written agreement on November 1, by the terms of which the plaintiff agreed to

"Faithfully and diligently serve the said party of the first part [defendant] on the South Side Farm, near White Bear Lake, Minnesota, and at and about the work of the same, for a term of one year from the date hereof, and that the said party of the first part is to pay the said party of the second part for such service one-half the net profits of said farm during such term."

Provision was therein made for taking inventories, and a method for ascertaining the net profits during the year of employment. The plaintiff was allowed to draw on account of his share of the prospective profits $25 a month, out of which he was to pay his board; and there were other provisions, of no particular consequence here.

The plaintiff commenced work immediately, and evidently had general charge. On July 17, 1901, the agreement was extended in writing so that it became an entire contract for the entire term of twenty-three, instead of twelve, months. Soon after the original agreement was entered into, the defendant went to California, returning to the farm in the month of April following. About the middle of September, 1901, the defendant again went to California. No difficulty seems to have arisen between the parties until December, 1901. Outside of the department of dairying and the

development of stock, the plaintiff appears to have been an unsuc-
cessful farmer, but in matters pertaining to the cattle he was
remarkably capable. In accordance with rules adopted by breed-
ers of Holstein-Friesian cattle, he caused tests to be made of indi-
vidual members of the herd, through which several cows attained
what is known as "advanced registry" rank, winning a number of
prizes. In November, Canary, one of the cows, made a record,
under this test, which placed her at the head of her class, where
she remained for several months. In December, Mercedes, an-
other cow, made a record which surpassed anything previously
made in the world. Other high records were made, but the two
we have mentioned were the most noticeable. The cow Canary
had been inventoried when the agreement was made at $135. She
was afterwards sold for $600, and to this sale allusion will be
made later. The cow Mercedes, inventoried at $200, was finally
sold for $2,500, and this sale will be specially referred to here-
inafter. The progeny of these two cows increased in value to a
surprising degree, and all of the cattle seemed to have obtained
high rank with breeders all over the United States.

In February, 1902, defendant hastily returned from California,
and, after a week's investigation of affairs at the farm, peremp-
torily dismissed the plaintiff. This led to the bringing of this
action by the latter. It is somewhat difficult, from the complaint,
to determine whether plaintiff therein considered the contract as
rescinded by the discharge, and sought to recover the value of his
services upon quantum meruit, or treated it as still in force, in so
far as his right to recover his share of the profits was concerned.
He alleged defendant to be indebted to him on account of services
rendered up to the time he was discharged in the sum of $6,000,
less $306.64, which he admitted he had received and been paid.
The answer alleged that the plaintiff was unfaithful, disobedient,
untruthful, and dishonorable, and had persistently refused to com-
ply with defendant's reasonable and proper instructions and or-
ders in the course of and in relation to his employment. The
answer went further, and set out in detail a number of matters
concerning which the plaintiff had been unfaithful, had disobeyed
instructions, and had defied defendant while in his employment.

Among these details were the allegations that plaintiff had collected and received money belonging to defendant while upon the farm, for which he had failed to account or give credit, and also that he had in several instances appropriated defendant's property to the payment of his own debts, without accounting or giving credit for the same. In brief, it attempted to justify the dismissal upon the ground of unfaithfulness, and also of disobedience of the reasonable orders of the defendant in reference to his employment. Based upon the alleged appropriation of money to plaintiff's use, and of defendant's property to the payment of his personal debts, defendant counterclaimed in an amount exceeding $800. The plaintiff duly replied, and the case was brought to trial before a jury.

At the trial it was shown (and the plaintiff did not really attempt to controvert it) that he had received about $400 on account of the provision in the agreement under which he was permitted to draw $25 a month, and that he had received in addition to this nearly $600; a part being moneys used by him without credit to defendant, and a part in property belonging to the latter which plaintiff had appropriated to the payment of his own debts; the total being $973.56. The jury found a verdict for plaintiff, by which it seems that they estimated the value of his services for sixteen months at $5,000, from which they deducted the admitted indebtedness of $973.56, returning a verdict for the exact difference. Defendant's counsel then made the alternative motion for judgment notwithstanding the verdict, or, in case that was denied, for a new trial. The court below denied the motion as a whole, but reduced the verdict, fixing the plaintiff's services at $3,000, and deducting therefrom the amount of the admitted indebtedness before mentioned. The plaintiff accepted this reduction, in writing, and the defendant then appealed from the order.

We shall assume, for the purposes of this case, as did counsel for the respective parties, that plaintiff's complaint treated the contract as having been rescinded by the discharge, and that this action was brought to recover upon quantum meruit. We shall also assume (what seems to be admitted, and of which there can be no doubt) that inter se the relation of master and servant was

created by this contract, and, as a necessary result, that in all matters pertaining to the management of the farm, including the sale of cattle, the defendant was the master, and the plaintiff his servant. With these undisputed facts, the law applicable to the case is not in controversy, except in one particular, to be considered later. The facts which preceded and led up to the discharge were not in dispute between the parties.

Concededly, the relation of master and servant which existed between these parties cast certain duties upon the plaintiff, as the servant, which he was bound to fulfil and discharge; and the principal one was that of obedience to all reasonable orders of the defendant, the master, not inconsistent with the contract. Disobedience of reasonable orders is a violation of law which justifies a rescission by the master of the contract of employment, and the peremptory discharge of the servant. Jerome v. Queen City, 163 N. Y. 351, 57 N. E. 485; Peniston v. John Y. Huber Co., 196 Pa. St. 580, 46 Atl. 934.

So, if.the orders given by the defendant were reasonable, under the circumstances, the discharge was in accordance with law, and was justifiable. If, upon the other hand, the orders were unreasonable, the discharge was contrary to law, unjustifiable, and would not protect defendant in an action brought by plaintiff to recover the reasonable value of his services. The defendant, when contracting with plaintiff, did not abdicate his right to manage his own business; nor did he surrender his position as owner of the farm and of the personal property thereon. He still retained the right to control his own affairs in his own way, and any behavior of his servant in opposition or in violation of his reasonable orders and commands amounted to insubordination, which has always been held sufficient ground for the discharge of a servant. The agreement being an entire contract for the period of twenty-three months, the plaintiff, in case he was lawfully discharged, could recover nothing for his services. Huntington v. Claflin, 10 Bosw. 262, affirmed, Huntingdon v. Claffin, 38 N. Y. 182; Allen v. Aylesworth, 58 N. J. Eq. 349, 44 Atl. 178. See also Peterson v. Mayer, 46 Minn. 468, 49 N. W. 245; McGrath v. Cannon, 55 Minn. 457, 57

N. W. 150. The consequences of his disobedience and insubordination followed, as a matter of law, although serious and severe. On the contrary, if he was wrongfully discharged, his right to recover is unquestionable, and a verdict in his favor for some amount could be sustained.

This brings us to the disputed question of law in the case, and to which we have alluded; the defendant's counsel claiming that the court below should have held, on the admitted facts, and as a question of law, that the plaintiff was rightfully discharged, and was not entitled to any compensation whatsoever for his services. This question was argued at length in the court below, as it has been here; and, if defendant's counsel are right, it would seem to follow that the defendant was entitled to a verdict for the full amount of his counterclaim, as alleged and proven. But at the trial this right to recover upon the counterclaim was waived by counsel, except as to a nominal sum, and nothing whatever was claimed at the argument of the alternative motion in the court below. And the counterclaim has also been waived upon appeal.

It is the universal rule, frequently formulated in this court, although not in this precise language, that where the facts are not in dispute it is for the trial court to determine, and on appeal for this court to decide, as a matter of law, whether these facts are sufficient to support a verdict in favor of the plaintiff, or to justify any particular act—such, for instance, as the discharge of a servant by his master, and if they are insufficient, as a matter of law, to so declare. A statement pertinent to this particular case is well put, as follows: "Uncontradicted facts, with the logical deductions therefrom, all pointing in the same direction, present a question of law for the court, and not a question of fact for the jury. * * * Courts will not permit juries to guess or speculate when, from the undisputed evidence, it is apparent that the order of the master was reasonable, and that the servant was guilty of insubordination." Jerome v. Queen City, supra, and cases cited.

If, then, the master's orders are reasonable and are disobeyed, even if they seem harsh and severe, it is improper to submit to the jury the question of the master's right to discharge. Again, the motives which actuate the master in discharging the servant

are wholly immaterial, for the act is justified if any legal grounds therefor existed at the time; and it is also immaterial whether the grounds were known to the master, or not, when discharging the servant. Nor is it necessary for the master to assign a reason for the discharge, and, should he assign one, he is not bound by it; nor is he estopped to rely upon some other or different reason or cause, whether known to him at the time of the discharge or not. Wood, Mast. & Serv. (2d Ed.) § 121; 20 Am. & Eng. Enc. (2d. Ed.) 33. The law is: "The servant is bound to obey all the master's lawful and reasonable commands, even though such commands may, under the circumstances, seem harsh and severe. * * * This is required not only by the contract, but also is suggested by sound public policy. It is no excuse for disobeying the master's orders that such disobedience resulted in no loss to him; nor even that obedience thereto would have involved him in loss, or that such disobedience really resulted to the master's benefit. It is not a question of profit or loss, or of results at all, but of insubordination, which is inconsistent with the relation, and involves a breach of the implied condition of the contract." Wood, Mast. & Serv. (2d Ed.) § 119.

As before stated, the plaintiff, while a most remarkable success as a stockman, appears to have been incapable and inefficient as a general farmer. While the profits were enormous on the stock,— especially upon the cattle,—it seems that there was very large loss, taking the farm as a whole, for it was shown, without contradiction by the plaintiff, that the entire profits for the sixteen months were but $1,651.50. But as we regard the case, this is of no materiality.

We have examined the long record with great care, with a strong inclination to affirm the order appealed from, if possible. But the conclusion is that the undisputed testimony is of such a clear and cogent character in respect to plaintiff's disobedience in matters relating to the employment, and as to his conduct otherwise, that it must be held, as a matter of law, that the orders and commands of the defendant, as master, were reasonable, and should have been obeyed; that the plaintiff, as a servant, with a persistence amounting to perversity, or something more, disre-

garded and disobeyed the master; that he defied his authority, and otherwise misbehaved; and, as a result, that his discharge, although the consequences are very serious to him, was absolutely and unqualifiedly justified. Perhaps the plaintiff, notwithstanding his disobedience, was entitled to more consideration than he received at defendant's hands, but we have found it impossible to conclude that there was any question of fact in relation to the reasonableness of the orders or the dismissal to be submitted to the jury. Taking the circumstances and all the facts known to the defendant when he discharged the plaintiff, and those then unknown, but which were properly in evidence at the trial, there can be no other or different conclusion, and the trial court should have so held.

Taking up in detail the facts in evidence which were known to defendant when he discharged the plaintiff, separately from those which were unknown, but which subsequently came to his knowledge, it may be stated that it was conclusively shown that the plaintiff refused to obey the defendant's reasonable instructions respecting the sale of the cow Canary. The defendant learned while in California that two parties, Mattison and Daggett, each claimed to have purchased the animal from plaintiff (Mattison for $600, and Daggett for $500). Defendant then wrote to plaintiff to do nothing about either sale until he could ascertain the facts, and do what was right and just between the parties. This was a reasonable order, obviously. When plaintiff wrote that Mattison would pay $100 more than Daggett, he was immediately advised that the latter stood ready to pay $600, and he was again positively told that the dispute must be submitted to defendant. He promptly disobeyed, and delivered the cow to Mattison. This was a flagrant breach of duty. The plaintiff's disposition concerning this affair is best indicated by the record, from which it appears that when upon the witness stand he was asked if he thought that defendant had no right to tell him what to do in this matter. His answer, and what followed in immediate connection therewith, are shown by the following quotation:

"A. He [defendant] didn't have any right to sell the cow for

$500, when I [plaintiff] could get $600 for her; certainly not. Q. So your position was that you had a right to sell the cow? A. Yes, sir. Q. And that Mr. Tompkins had no right to interfere? A. No, sir. Q. And that you were boss there? A. Well, as long as Mr. Tompkins was in California, evidently I was. Q. And you didn't intend to pay any attention to his instructions when they differed from your own judgment? A. Well, if I could get $100 more for the cow, I certainly would sell it, and so would anybody else with common sense. Mr. Tompkins says he runs the farm for pleasure, and I was there for business. That is the difference."

But it is claimed that this transaction was condoned. It appears that defendant, upon learning that plaintiff had delivered the cow to Mattison, again wrote from California, reprimanding him for his disobedience, and demanding that in the future his (defendant's) orders be obeyed. To this the plaintiff replied that in the future he would do as directed, and thereupon the defendant advised him by letter that his answer as to his future conduct was satisfactory. There is very much doubt as to whether, under the circumstances, this amounted to a condonation of the prior absolute disregard of the defendant's orders, because many things concerning this transaction were not known to the latter at the time of the alleged forgiveness.

However, we may treat this affair as having been condoned by the defendant, and pass on to what is known as the "McAdam Transaction," with the remark that if plaintiff was justified, in any case, in claiming that if he had obeyed defendant's instructions he would have sold the animals for less money than he could obtain himself without interference, this fact would be a proper matter for consideration when ascertaining the plaintiff's share of the profits. A sale under such circumstances would not preclude plaintiff from insisting that he have the benefit of the figure at which he could have sold. McAdam resided in New York, was a man of large means, and desirous of securing the best herd of Holstein-Friesian cattle in the United States. He learned of the wonderful record made by the cow Mercedes, and immediately opened a correspondence with plaintiff, looking to the purchase of quite a number of animals out of defendant's herd, including that cow. Almost at the outset of the correspondence, he informed

plaintiff that, if he purchased a "bunch" of cattle, he should want him to go with them to the New York farm—in what capacity was not stated. Plaintiff advised defendant, who was still in California, of McAdam's proposition; and to this defendant wrote that, if the sale was made, an arrangement could probably be made through which the plaintiff could go with the cattle.

At the trial the letters from plaintiff to McAdam were not produced, but those from the latter to the former were introduced in evidence and read. It was plain from these letters that the correspondence very soon developed into a proposal from McAdam that the plaintiff go into partnership with him in the stock business on the New York farm, and the proposition was favorably considered by plaintiff. McAdam was exceedingly anxious to secure Mercedes, and his letters had special reference to that animal. In one he suggested that, if plaintiff would agree to go with him, selections could be made from the defendant's herd to good advantage, because "you would know just what to buy to do the most good." In another, speaking of the prospective partnership, and the purchase of some of defendant's cattle, he wrote, "My plan would be only to buy the extra good ones;" and, again, if an arrangement could be made to secure Mercedes, "That would give us a great start. You better hold onto her until we get this matter settled." Again, writing to plaintiff that he was coming to White Bear to examine the cattle, and that it could then be decided just what would be done between them, he said: "Of course, we will try to buy them as cheap as possible, and you will keep them until I can get there." In this same letter he spoke of the "new firm"—evidently referring to the contemplated partnership. Later he wired to plaintiff: "Will see you thirteenth. Hold stock until I come."

As before stated, what plaintiff wrote to McAdam was not disclosed by the record; but it is safe to say that nothing was written by him which in any way controverts the charge that while plaintiff was in defendant's employ, and without his knowledge, he was arranging an immediate partnership with McAdam, and that the "new" firm was to buy choice cattle from defendant's herd as cheap as possible, in the expectation that such a purchase would give that

firm a good start and considerable advantage. Now, when defendant discharged the plaintiff, he knew nothing about these letters, except that McAdam was negotiating for certain cattle, and, if the purchase was completed, that he wanted plaintiff to go with him. Certainly he did not know that the partnership was contemplated, with his own stock as a "good start." During all this time the defendant was positive and unequivocal in his orders, by letter and by wire, that none of the high-record cattle, nor any of their progeny, be sold until he had agreed thereto. If an offer was made by any person, it was to be submitted to the defendant by wire or mail, as plaintiff thought best. He was particularly plain and specific in all of his communications—especially all concerning the cow Mercedes and her offspring, of which there were two or three. To support this assertion, we might quote from the letters written by defendant to plaintiff on this subject, and to the various telegrams in which he again and again forbade the sale of any of the high-record cattle unless he was consulted with, but it is unnecessary. Even when the plaintiff wrote defendant, on February 4, that McAdam stood ready to pay $2,500 for Mercedes, $1,500 for her yearling heifer, $500 for one of Canary's offspring, and $300 for her calf (a total of $4,800), "provided I go with the cattle on his farm," the defendant immediately replied:

"I don't want you to sell any of those high-record cattle, nor any of their progeny, till I have agreed to the same," and closed his letter by saying, "Follow these instructions exactly."

February 13, in spite of these commands, the plaintiff sold to McAdam nineteen of these high-record cattle, including Mercedes for $2,500, her heifer for $500, Canary's young calf for $225, and the other for $300—a total of $3,525. Eight days before this he had given his opinion in a letter to defendant, and had scheduled this nineteen head of cattle at $8,675. He sold them for $5,925— less than sixty-nine per cent. of his estimate or scheduled value— and the only excuse offered by him on the trial for making such a discount was that he sold nineteen head in one lot. He gave McAdam a bill of sale of the cattle, although they were not to be removed from the farm for about three months. In passing, we

may remark that, from the affidavits presented to the court below upon the hearing of the alternative motion, it was shown in support of the contention that another trial should be granted upon the ground of newly discovered evidence that the plaintiff went with the cattle in May, and immediately formed a partnership with McAdam in New York in the business of raising, buying, and selling Holstein-Friesian cattle. When upon the witness stand he was asked if he had not sold the nineteen head of cattle for about $3,000 less than he had valued them in his letter to defendant, and in the schedule, eight days before. His answer was:

"I don't know. I don't exactly remember how I priced the cattle. As a matter of fact, if Mr. McAdam had offered a thousand dollars less for the cattle, I would have sold him the cattle just the same. Q. Sell without consulting Mr. Tompkins? A. Yes, sir; Mr. Tompkins did not answer my statement. I did not hear from him. There was plenty of time to answer."

We have said enough on this subject to demonstrate thoroughly that the plaintiff purposely, and, we think, for a very apparent reason, had determined to sell to McAdam the most valuable animals in the defendant's herd, and that he wilfully disregarded the defendant's reasonable orders not to do so, and that, without further consultation with defendant, he had agreed to go to McAdam's farm as a partner while his contract with defendant was still in force. His excuse that defendant did not answer his statement, and that he did not hear from him, was mere subterfuge, for the record shows that in the course of three weeks, just prior to this sale, the plaintiff was directed again and again to make no sales unless the defendant was advised and consented. Nor did he sell in accordance with that statement. His other excuse, that he could not consult defendant because he was fifteen hundred miles away, in California, was also frivolous, for there was no difficulty in corresponding by wire in less than two hours, or by mail in eight days. The correspondence between these parties was almost daily up to this sale. The defiant attitude of the plaintiff all through this matter is shown in one of his letters, in which he said to defendant, "You must not take me for your servant." Subsequently he apologized for using such language. And in an-

other letter, "I am not here for my health." But it is urged that defendant himself approved this sale, by delivering the cattle and accepting payment. The all-sufficient answer to this is that Mc-Adam and his attorney confronted him with the bill of sale and threats of litigation if he did not consummate the deal.

We now come to a brief consideration of the facts concerning which defendant had no knowledge until after the discharge. In October, 1901, plaintiff sold to one Schilling, who resided in North-field, some cattle from the farm, including the cow Canary before mentioned. Canary then had no record. The contract was verbal, and the cow was to be tested at the farm, and under plaintiff's supervision, before being delivered. A few days after this she made a remarkable record at the test, and, as before stated, became champion of her class. Plaintiff immediately wrote "my dear Schilling" that he had "to report a rather sad story"; that Canary Butterfly had been severely hurt in her udder; that he would not insist upon his taking her, but would give him his choice of other cows in the herd—particularly recommending a certain one. The fact was that Canary was not injured at all. Schilling knew nothing of this, was misled by the letter, and consented to the substitution of another cow. Later on he read of the remark-able showing made by Canary in the test, and wrote plaintiff for an explanation. The latter replied that he had offered to sell Canary Butterfly—not the cow Canary which had made the great record. The fact was that there was no such cow as Canary Butterfly in the herd. The defendant knew nothing about the imposition until after the discharge, when it came to light. On the witness stand the plaintiff's excuse for the trick was that he was under no legal obligation to deliver Canary to Schilling, be-cause their agreement was verbal, and void under the statute of frauds. He admitted the falsehood. It might have been legiti-mate, and, as a business transaction, justifiable, if he had told the truth in his letter to Schilling; but, instead of doing so, he induced him to relinquish his claim upon Canary through falsehood and deceit. This was a breach of good morals, and the defendant had a right to so regard it, when discovered by him.

There were other transactions, which we shall not consider in

detail. We have heretofore outlined them. He ignored that part of the contract which fixed his monthly allowance at $25 per month, and overdrew about one hundred fifty per cent. He falsified his books, claiming upon the witness stand that these falsifications were simply due to mistakes. His cross-examination demonstrated that they could not have been honest errors. He repeatedly appropriated money to his own use which belonged to the farm, and should have been credited to it and charged to himself. He repeatedly sold products of the farm, including stock, to liquidate his personal debts, and failed to credit the farm or to debit himself. It may be that he was not a bookkeeper, and certainly he could not be expected to keep a perfect set of books; but surely he ought to have known that both money and property belonging to the farm, which were used for his own personal purposes, should have been charged to himself, and it is no excuse to say, as he did on the witness stand, that he did not know how to enter these items upon the account books. They show that he knew perfectly well how to enter transactions or items by or through which he was to be benefited. All of his errors and omissions were to his own advantage and for his own profit.

That the plaintiff greatly overdrew his account, without having any authority to do so, during the defendant's last visit to California, stood admitted. This of itself was contrary to his agreement, because under it the amount to be advanced was fixed, in anticipation of the profits, at $25 per month, and no more. And finally he negotiated with McAdam, and undoubtedly formed a partnership, to commence May 1, in utter disregard of the agreement to remain with defendant until October 1, and in violation of it. The defendant was not advised of the contemplated arrangement. He was simply told that, if McAdam purchased cattle, he wanted plaintiff "to go with them." This was not equivalent to information of what was actually intended. There were so many acts of disobedience performed by plaintiff, and so many different transactions in which he was engaged, wholly incompatible with the relation which exists between a master and his servant, that no excuse can be offered for plaintiff's conduct. That he was something more than an ordinary laborer can make no difference. He

did not "faithfully and diligently" serve the defendant, as he had expressly agreed to do, and for that reason he was not entitled to any compensation whatsoever for his services. The court below erred when it submitted the case to the jury, and again when it denied defendant's motion for judgment notwithstanding the verdict.

The cause is remanded, with directions that judgment be entered for defendant.