(921 P.2d 224)

No. 74,272

PEGGY GASSMAN, *Appellant*, v. THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, INC., *Appellee*.

Opinion filed July 26, 1996.

*Preston A. Pratt* and *Steven W. Hirsch*, of Hirsch & Pratt, L.L.P., of Oberlin, for the appellant.

*Christopher R. Hedican* and *Christopher E. Hoyme*, of Berens & Tate, P.C., of Omaha, Nebraska, for the appellee.

Before GERNON, P.J., PIERRON, J., and DAVID R. PLATT, District Judge, assigned.

PIERRON, J.: This is a wrongful discharge case based on the employment termination of Peggy Gassmann. Gassmann appeals the district court's grant of summary judgment in favor of The Evangelical Lutheran Good Samaritan Society, Inc. (Good Samaritan). Specifically, Gassmann argues the district court erred in applying the after-acquired evidence doctrine and that such evidence, in any event, did not constitute a violation of company policy for which she could have been terminated.

The facts in this case are for the most part undisputed. Good Samaritan is a corporation which owns and operates nursing homes in many states throughout the Midwest, one of which is the Decatur County Good Samaritan Center in Oberlin. Gassmann worked at Good Samaritan from September 16, 1985, to December 10, 1993, as a certified nurse's aide. She was terminated for

inconsiderate treatment of residents. On June 27, 1994, Gassmann filed a wrongful discharge lawsuit based upon Good Samaritan's violation of an implied employment contract and violation of public policy. She sought an award for back pay and reinstatement.

At her September 17, 1994, deposition, Gassmann admitted that while she was still employed at Good Samaritan, she entered the office of the acting director of nursing without authorization and took a videotape of a company in-service meeting. She copied the videotape and then returned it to the office the next morning. In her deposition testimony, Gassmann agreed that the purpose for taking the tape was to serve as evidence in an effort to get rid of the acting facility director.

On December 5, 1994, Good Samaritan filed a motion for summary judgment. The basis for the motion was neither the implied contract nor the facts surrounding Gassmann's termination, but instead was the evidence acquired during her deposition concerning the videotape. Good Samaritan requested that the district court adopt the after-acquired evidence doctrine, *i.e.*, evidence discovered after an employee's termination can be used to justify the discharge, if the evidence would have also been sufficient to terminate the employee, and grant its motion.

Good Samaritan submitted an affidavit from its administrator indicating that all employees received an employee handbook which states that any employee will be terminated if found to have engaged in "theft from coworker(s), resident(s), and/or the facility." Gassmann acknowledged receipt of copies of all Good Samaritan's employee handbooks. The administrator stated that if Gassmann had still been employed when he learned of the "theft" of the videotape, he would have immediately terminated her.

In her affidavit, Gassmann explained that all employees of Good Samaritan were required to either attend all in-service meetings or, if unable to attend, watch the videotape of the meeting. The facility director became upset at a particular in-service meeting, and Gassmann stated she wanted to watch the videotape of that meeting because she had missed the meeting. Gassmann also stated that prior to her termination, there had been much dissension between the employees and management of Good Samaritan.

However, Gassmann contends she had no intent to use the videotape in an effort to get the acting director fired. Contrary to her deposition, she stated in her affidavit, "I made the copy in order to preserve the tape because I was afraid the tape, which showed the director acting inappropriately, would 'get lost'. I did not make the copy in a mutinous attempt to get [the director] fired."

Gassmann also submitted the affidavit of Lila Keenan, a former employee of Good Samaritan. Keenan confirmed Gassmann's statements that all Good Samaritan employees were required to watch the videotape of any missed in-service meetings. Keenan stated the only rule regarding taking videotapes was that they were to be returned quickly so others would be able to watch them. Keenan maintained she had taken a videotape home before to watch a missed in-service meeting and then returned it. Keenan did not believe this violated a company policy.

The district court specifically adopted the after-acquired evidence doctrine and granted summary judgment in favor of Good Samaritan. The district court denied Gassmann's motion for reconsideration.

The issue of the applicability of Gassmann's taking the videotape, evidence which became apparent to Good Samaritan only in the course of discovery during this litigation, is not a simple one. Analysis of this issue necessitates an examination of the admissibility and effect of "after-acquired evidence."

The after-acquired evidence doctrine in its purest form allows an employer to be relieved of liability in a wrongful discharge lawsuit where it is discovered, normally during litigation, that the employee was guilty of pre-discharge misconduct sufficient for termination that the employer was unaware of and was not relying upon for discharge. See *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700 (10th Cir. 1988); Yoo, *The After-Acquired Evidence Doctrine*, 25 Colum. Hum. Rts. L. Rev. 219, 228 (Fall 1993) (the *Summers* rule). The after-acquired evidence doctrine has its foundation in the logic that an employee cannot complain about being wrongfully discharged because the individual is no worse off than he or she would have been had the truth of his or her misconduct been presented at the outset. See Annot., *After-Acquired*

*Evidence of Employee's Misconduct as Barring or Limiting Recovery in Action For Wrongful Discharge*, 34 A.L.R.5th 699, 707.

The Kansas appellate courts have yet to rule on the issue of after-acquired evidence. Our analysis begins with the United States Supreme Court's recent decision in *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995). In *McKennon*, the Court granted *certiorari* to resolve a split among the Circuit Courts of Appeals regarding the question of whether all relief must be denied when an employee has been discharged in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* (1994), and the employer later discovers some wrongful conduct that would have led to discharge had it been discovered earlier. 513 U.S. at 356.

The court in *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1238 (4th Cir. 1995), explained the split in this manner:

"Some circuits held that an after-acquired motive for an otherwise discriminatory action provided a complete defense, precluding a plaintiff from establishing liability or obtaining relief for the employer's conduct in violation of the law. *See, e.g. Summers*, 864 F.2d at 708. Others held that such after-acquired evidence of employee wrongdoing should only concern the remedies available to the employee once liability was established, and that it should not be admissible unless the employer demonstrated that it would have discovered the evidence in the absence of the discrimination litigation, because, otherwise, the employer would benefit from its discriminatory conduct. *E.g., Wallace*, 968 F.2d at 1181-84."

In *McKennon*, the plaintiff, a 62-year-old employee of Nashville Banner Publishing Company for 30 years, was discharged in what Banner termed a "work force reduction plan necessitated by cost considerations." 513 U.S. at 354. McKennon filed suit alleging that her discharge violated the ADEA. In a deposition prior to trial, McKennon admitted to copying several confidential documents bearing upon the company's financial condition. She had access to these documents as secretary to Banner's comptroller. Her motivation for copying the documents was "insurance" and "protection" in case she was fired because of her age. Shortly after this deposition, Banner sent McKennon a letter claiming that the removal and copying of the records was in violation of her job responsibilities and again advised her that she was terminated.

Banner filed for summary judgment based on the evidence discovered during McKennon's deposition. Banner conceded its age discrimination against McKennon. The district court granted Banner's motion, holding that McKennon's misconduct was grounds for her termination, and that neither back pay nor any other remedy was available to her under the ADEA. The United States Court of Appeals for the Sixth Circuit affirmed on the same rationale. The United States Supreme Court disagreed.

In *McKennon*, the Supreme Court rejected the line of discrimination cases holding that after-acquired evidence of misconduct acted as a complete bar to recovery in an ADEA action, concluding that it only affects the amount of damages an employee may recover. 115 S. Ct. at 886. See also *Manard v. Fort Howard Corp.*, 47 F.3d 1067 (10th Cir. 1995) (*McKennon* "largely rejected" the line of cases holding that after-acquired evidence of employee misconduct barred recovery in discrimination cases). The Court determined that "after-acquired evidence" of misconduct during employment is relevant in a discrimination case:

"In determining appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee, or out of concern 'for the relative moral worth of the parties,' *Perma Mufflers v. International Parts Corp.*, [392 U.S. 134,] 139, 88 S. Ct. [1981,] 1984, [20 L. Ed. 2d 982 (1968)], but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." 513 U.S. at 361.

The Court determined that the availability of remedies in discrimination cases involving after-acquired evidence had to be determined on a case-by-case basis, but certain remedies were obviously unrealistic:

"The proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise will vary from case to case. We do conclude that here, and as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy. It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." 513 U.S. at 361-62.

The *McKennon* Court had more difficulty with the question of whether after-acquired evidence of wrongdoing barred back pay awards. Writing for a unanimous court, Justice Kennedy explained that such after-acquired evidence is not a complete bar to recovery because the purposes of the ADEA's remedial provisions, as well as other anti-discrimination statutes, are to compensate employees for injuries caused by prohibited discrimination and to deter employers from engaging in such discrimination. See Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994) (race, color, sex, national origin, and religion); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (1994) (disability); the National Labor Relations Act, 29 U.S.C. § 158(a) (1994) (union activity); the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1994) (sex).

Such anti-discrimination purposes would be thwarted if after-acquired evidence of wrongdoing barred all relief in a discrimination case. The ADEA and Title VII share common substantive features and also a common purpose: "the elimination of discrimination in the workplace." *McKennon,* 513 U.S. at 358. With these purposes in mind, the Court sought to balance the concerns of both sides:

"The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered. In determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party. An absolute rule barring any recovery of backpay, however, would undermine the ADEA's objective of forcing employers to consider and examine their motivations, and of penalizing them for employment decisions that spring from age discrimination." 513 U.S. at 362.

Many of the pre-*McKennon* discrimination cases finding that after-acquired evidence provided a complete defense to a wrongful discharge lawsuit relied on "mixed-motive" termination cases for authority, *i.e.,* where the employer was motivated by both legitimate and illegitimate reasons. See *Summers,* 864 F.2d 700. The Supreme Court in *McKennon* explained that the "mixed-motives" termination cases are not relevant in after-acquired evidence cases:

"In *Mt. Healthy* we addressed a mixed-motives case, in which two motives were said to be operative in the employer's decision to fire an employee. One was lawful [obscene gestures], the other (an alleged constitutional violation) unlawful [First Amendment freedom of speech]. We held that if the lawful reason alone would have sufficed to justify the firing, the employee could not prevail in a suit against the employer. The case was controlled by the difficulty, and what we thought was the lack of necessity, of disentangling the proper motive from the improper one where both played a part in the termination and the former motive would suffice to sustain the employer's action. [*Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 284-87, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977).]

"That is not the problem confronted here. As we have said, the case comes to us on the express assumption that an unlawful motive was the sole basis for the firing. McKennon's misconduct was not discovered until after she had been fired. The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason. Mixed motive cases are inapposite here, except to the important extent they underscore the necessity of determining the employer's motives in ordering the discharge, an essential element in determining whether the employer violated the federal antidiscrimination law. [Citations omitted.] As we have observed, 'proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made.' [Citations omitted]." 513 U.S. at 359-60.

In the present case, the district court recognized that the United States District Court for the District of Kansas has repeatedly endorsed the after-acquired evidence doctrine in cases similar to *McKennon*. In *Mathis v. Boeing Military Airplane Co.*, 719 F. Supp. 991 (D. Kan. 1989), the plaintiff claimed her former employer discriminated against her on the basis of race and sex. During discovery it was uncovered that the plaintiff had made material omissions on her employment application regarding her employment history and prior felony convictions. The federal district court, relying on *Summers*, 864 F.2d 700, found that the after-acquired evidence precluded the plaintiff from recovering damages and granted the defendant's motion for summary judgment. 719 F. Supp. at 993-95. See also *Churchman v. Pinkerton's Inc.*, 756 F. Supp. 515 (D. Kan. 1991). However, the decisions in both *Mathis* and *Pinkerton's Inc.*, are incorrect inasmuch as they conflict with *McKennon*. See *Miller v. Bircham, Inc.*, 874 F. Supp. 337, 340-41 (D. Kan. 1995).

Gassmann argues that under *McKennon*, if the allegations of theft are sufficient to give legal reason for discharge, she would not be entitled to reinstatement or front pay, but she would be entitled to back pay from her termination until the time Good Samaritan actually discovered her theft. However, Gassmann states that in *McKennon* there was no factual dispute that McKennon had committed misconduct and could therefore be terminated. Gassmann submits that unlike *McKennon*, the issue of her intent in taking the videotape should preclude the grant of even partial summary judgment on the issues of reinstatement and front pay.

Good Samaritan acknowledges *McKennon* and its ramifications, but argues that the policy concerns at stake in applying the after-acquired evidence defense to an unlawful discharge based on discrimination are not implicated in a private employment contract action. Good Samaritan states that Gassmann's claim arises out of an alleged employment contract she contends they have breached. Gassmann does not allege a claim under any federal or state discrimination statute. Good Samaritan contends that the principles of *McKennon* are preserved in the present type of case and the after-acquired evidence doctrine is fully intact to bar all relief. Last, Good Samaritan argues that even if the court finds *McKennon* applicable, it is still entitled to partial summary judgment on the issues of front pay, reinstatement, punitive damages, and all other relief from the time after they discovered Gassmann's theft.

The first issue facing this court is whether the *McKennon* line of discrimination cases applies to the case at bar. If applicable and Good Samaritan can prove proper after-acquired evidence, then all Gassmann would be entitled to under *McKennon* is back pay, if she can prove wrongful termination (reinstatement and front pay both being inappropriate remedies). However, the reason back pay was allowed in *McKennon* was to combat age discrimination. Obviously, if Good Samaritan does not have enough after-acquired evidence to justify termination, then Gassmann's remedies would not be limited. Alternatively, if *McKennon* is not applicable and Good Samaritan has sufficient after-acquired evidence, Gassmann would be without recourse.

Once the discriminatory actions of the employer are eliminated from the equation, we ultimately get back to the underlying principle that after-acquired evidence is a complete bar to any recovery by the former employee where the employer can show it would have fired the employee on the basis of the evidence. *McKennon*, 513 U.S. at 361-63.

Our holding today is in accord with other courts' holdings that if after-acquired evidence would justify termination, the employee may not recover any damages for the period following the actual dismissal. See, *e.g.*, *Leahey v. Federal Exp. Corp.*, 685 F. Supp. 127 (E.D. Va. 1988); *Von Heyne v. Tompkins*, 89 Minn. 77, 93 N.W. 901 (1903); *Schuessler v. Benchmark Mktg. & Consulting*, 243 Neb. 425, 500 N.W.2d 529 (1993). Generally, an employer may defend a wrongful discharge claim on the basis of facts unknown at the time of discharge and, therefore, not an actual or inducing motive for the termination. 53 Am. Jur. 2d, Master and Servant § 46, pp. 120-21, provides:

"If legal grounds for the dismissal of an employee during the term of his employment exist, no importance attaches to the motive which may have actuated the employer in making the dismissal. It is not necessary that an employer, in order to justify a dismissal, show that in dismissing his employee he in fact acted upon some proper ground of dismissal. It is sufficient if a ground of dismissal existed at that time. It is not material whether the employer knew of grounds which in fact existed at the time of discharge; notwithstanding his ignorance, he may avail himself thereof, and in the event of his death, his representative has the same right. Nor is it material that the employer assigned another ground as the cause of the employee's dismissal. The employer may justify a dismissal by relying on a ground different from that assigned at the time of the dismissal."

Three different theories justify Good Samaritan's use of the after-acquired evidence doctrine to defend against a contract claim of wrongful discharge: fraud, legal excuse, and unclean hands. Kadue and Dritsas, *The Use of After-Acquired Evidence in Employee Misconduct and Resume Fraud Cases*, 44 Lab. L.J. 531, 534 (1993). Fraud is more akin to cases involving "resume fraud" or material misrepresentations on employment applications. See *Massey v. Trump's Castle Hotel & Casino*, 828 F. Supp. 314, 325 (D.N.J. 1993). However, legal excuse and clean hands are applicable to the present case.

"The concept of a legal excuse to cancel a contract is an ancient one. Indeed, although reliance on after-acquired evidence of misconduct is heralded as a 'new' defense in some contexts, an employer's ability to rely on that evidence is a long-established principle of contract.

. . . .

'A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a 'legal excuse' for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an 'adequate cause,' although it did not become known to him until later.'

"As applied to a wrongful discharge case, the propositions cited by Justice Brandeis would permit an employer to justify termination of an employment contract for an 'adequate cause' even if that justification was unknown at the time that the employer chose to terminate the contract for other reasons." Kadue and Dritsas, 44 Lab. L.J. at 534-35.

Accord Restatement (Second) of Contracts § 385, comment a (1979).

The after-acquired evidence doctrine also conforms with the fundamental maxim of equity that one who comes into equity must come with clean hands. See *Goben v. Barry*, 234 Kan. 721, 727, 676 P.2d 90 (1984); *Fuqua v. Hanson*, 222 Kan. 653, Syl. ¶¶ 2-5, 567 P.2d 862 (1977); see also 27 Am. Jur. 2d, Equity § 136, p. 667 (a litigant may be denied relief by a court of equity on the ground that his or her conduct has been inequitable, unfair, and dishonest, or fraudulent and deceitful as to the controversy in issue.) Furthermore, although the unclean hands doctrine originally arose in cases seeking equitable relief, courts have expanded·its application to contractual claims and other matters in law. Kadue and Dritsas, 44 Lab. L.J. at 536. The Court in *McKennon* explained the interplay of the clean hands doctrine and the anti-discrimination statutes:

"Equity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of unclean hands, a rule which in conventional formulation operated *in limine* to bar the suitor from invoking the aid of the equity court, 2 S. Symons, Pomeroy's Equity Jurisprudence § 397, pp. 90-92 (5th ed. 1941), has not been applied where Congress authorizes broad equitable relief to serve important national policies. We have rejected the unclean hands defense 'where a private suit serves important public purposes.' *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S.

134, 138, [88 S. Ct. 1981, 1984, 20 L. Ed. 2d 982] (1968) (Sherman and Clayton Antitrust Acts)." 513 U.S. at 360.

We find persuasive the case of *Schuessler*, 243 Neb. 425, as cited by Good Samaritan. Schuessler, vice president and chief operating officer of Benchmark, a telemarketing company which placed luxury car owners in touch with prospective buyers, was fired from the company. Schuessler was in the fourth month of his 1-year contract, and he filed suit for wrongful discharge. At trial, Schuessler established that he had met the sales quotas required by his contract and offered other evidence that he had complied with his contractual obligations. Benchmark alleged several reasons for Schuessler's termination, including (1) sexual harassment of at least one female employee at Benchmark, (2) his unauthorized pay increase for a subordinate employee, (3) his personal use of company time and equipment, and (4) his failure to properly supervise the employees under his control. The district court found that Schuessler had not acted in a manner warranting termination by Benchmark and awarded him $167,089.93 in damages, plus attorney fees and costs.

On appeal, the *Schuessler* court concurred that the latter three reasons did not constitute good cause for Schuessler's termination. Claims of Schuessler's sexual harassment were not discovered by Benchmark until after Schuessler's termination. The district court held the evidence of Schuessler's sexual harassment was irrelevant because it did not form the basis for Schuessler's discharge. The *Schuessler* court disagreed, stating that post-termination evidence or after-acquired evidence was admissible as bearing on an employee's recovery in a wrongful discharge suit. 243 Neb. at 439. Thus, the court held that once an employee has established a case of wrongful discharge, the employer may limit recovery by using post-termination evidence to prove employee misconduct which would have resulted in the justified termination of the employee. 243 Neb. at 439.

The *Schuessler* court recognized the persuasive reasoning of the federal discrimination cases, including *McKennon*, but found them inapplicable to its breach of contract case. The court stated:

"In those federal cases permitting prediscovery backpay, the rationale for allowing recovery appears to be that the employer should not be excused from its discrimination; i.e., the employer's liability should not depend on whether the employee also engaged in misconduct. See, *Wallace [v. Dunn Const. Co.*, 968 F. 2d 1174 (11th Cir. 1992)]; *Smith v. General Scanning, Inc.*, [876 F.2d 1315 (7th Cir. 1989)]. That situation is vastly different from the simple breach of contract action now before us.

"The aforementioned federal cases dealt with actions based on statutes which specifically prohibit discrimination. See, *Wallace, supra* (ruling on claims under 42 U.S.C. § 2000e (1988) and the federal Equal Pay Act of 1963, 29 U.S.C. §§ 206 and 215 (1988)); *Smith v. General Scanning, Inc., supra* (ruling on a claim under the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 through 634 (1988)). The liability associated with the employer's misconduct thus arises independently of the contract or any activity by the employee.

"Breach of a contract does not give rise to the same concerns or demand the same protections as does an action based on discrimination. Even more important, however, is the fact that in the present case Benchmark's liability is predicated solely on the contract. Assuming for the moment that the sexual harassment allegations are true, Schuessler should not be able to recover damages." 243 Neb. at 441.

Good Samaritan also directs the court's attention to *Bazzi v. Western and Southern Life Ins. Co.*, 808 F. Supp. 1306 (E.D. Mich. 1992). In *Bazzi*, the court faced a discrimination case under Michigan's Elliot-Larson Civil Rights Act. It ultimately denied summary judgment on Bazzi's discrimination claim, using rationale similar to *McKennon*, but granted dismissal of Bazzi's breach of contract claim. It appears *Bazzi* was subsequently reversed by the United States Court of Appeals for the Sixth Circuit during the time period when the Sixth Circuit decided *McKennon* and the United States Supreme Court subsequently reversed *McKennon*. *Bazzi* is applicable to the case at bar in that the court originally explained the difference of after-acquired evidence doctrine in the context of discrimination cases and those involving mere breaches of contract.

"The availability of noneconomic and emotional distress damages under Elliot-Larson demonstrates that the Michigan Legislature intended to provide redress for the consequences of impermissible discrimination, without limiting the employer's liability to breaches that otherwise sound in contract. The application of the after-acquired evidence doctrine urged by WSLIC is inconsistent with this intent, as it would permit an employer to escape all of the consequences of dis-

crimination through the fortuitous discovery of a basis for avoiding a contract. This result obfuscates the important distinction between the duties arising from contract and duties imposed by remedial legislation, and overlooks the distinctions between Title VII and Elliot-Larsen. A false statement on an employment application is not an insurance policy covering bigotry." 808 F. Supp. at 1310.

See *Massey v. Trump's Castle Hotel & Casino*, 828 F. Supp. at 325.

As recognized in *Schuessler, Bazzi,* and *Massey,* unlike the policies underlying anti-discrimination statutes, in ordinary breach of employment actions, there is no overriding governmental interest in preventing breaches to limit the applicability of the after-acquired evidence doctrine. Therefore, we find the limits placed on the after-acquired evidence doctrine disseminated in *McKennon* are not applicable to the case at bar and hold that this employee is not entitled to any relief if the employer can establish after-acquired evidence sufficient for termination.

The next issue for our consideration is whether, based on the facts presented to the district court on Good Samaritan's motion for summary judgment, the court should have held that Gassmann's conduct of taking and copying the videotape constituted just cause for her dismissal as a matter of law. Our review of cases decided on summary judgment is well established. In *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995), the court explained the scope of our review:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]"

The *McKennon* Court essentially established a three-prong test in order for an employer to rely on after-acquired evidence. An

employer must satisfy the following conditions: (1) The plaintiff was guilty of some misconduct of which the employer was unaware; (2) the misconduct would have justified discharge; and (3) if the employer had known of the misconduct, the employer would have discharged the plaintiff. 513 U.S. at 359-63. See *O'Driscoll v. Hercules, Inc.*, 745 F. Supp. 656 (D. Utah 1990). However, because of the posture of this case, we review these three prongs in light of our summary judgment standard of review.

Taking the *McKennon* factors in reverse, the third prong presents the easiest question for our disposal. Good Samaritan produced sufficient uncontradicted evidence that it would have terminated Gassmann had it known about her "theft" of company property. Where employers have shown they had a policy of terminating employees for certain rule violations and also submitted affidavits attesting that the rules are enforced, courts have consistently held that the employers satisfied their burden of showing that they would have fired the employee. See *O'Day v. McDonnell Douglas Helicopter Co.*, 784 F. Supp. 1466 (D. Ariz. 1992); *Churchman v. Pinkerton's Inc.*, 756 F. Supp. 515.

Good Samaritan's administrator, Craig Goth, attested in his affidavit that company policy would mandate that Gassmann be immediately terminated once her "theft" was known. This affidavit is essentially uncontradicted and presents strong support for Goth's assertions of knowledge in the areas of hiring and firing. The burden was on Gassmann to produce affirmative evidence that punctured Goth's assertion of knowledge regarding these matters, and she produced no such evidence. Good Samaritan's policy, in conjunction with Goth's affidavit, constitutes sufficient evidence to establish that Gassmann would have been terminated had Good Samaritan learned of her theft prior to her termination for inconsiderate treatment of residents.

However, the district court's grant of summary judgment on the first two prongs of the *McKennon* test seems inappropriate, considering the standards for awarding summary judgment. Gassmann argues she had no intent to permanently deprive Good Samaritan of the videotape and therefore there is a genuine issue of material fact as to whether she had the necessary intent and could be ter-

minated for cause. Gassmann also argues that Good Samaritan cannot prove the required intent to substantiate a claim of criminal theft. Theft, as defined under Kansas law, is any of the following acts done with intent to deprive the owner *permanently* of the possession, use, or benefit of the owner's property: (1) obtaining or exerting unauthorized control over property; (2) obtaining by deception control over property; (3) obtaining by threat control over property; or (4) obtaining control over stolen property knowing the property to have been stolen by another. K.S.A. 21-3701(a).

To support her claim of lack of intent, Gassmann cites her deposition and affidavit stating she took the videotape home overnight, copied it, and returned it the next morning. Gassmann states it was company policy that all in-service meetings were videotaped so that those employees not in attendance could watch the videotape and know what was discussed. Gassmann states she had no intent to use the videotape in a subversive manner. She also supports her claim with the affidavit of Lila Keenan, another former employee of Good Samaritan. Keenan stated that all employees of Good Samaritan were required to watch missed in-service meetings and that she had in fact taken a videotape home before and did not believe she had violated company policy.

On the other hand, Good Samaritan argues there is no dispute that Gassmann "stole" a videotape belonging to the company. Good Samaritan contends that theft, as mentioned in the employee handbook, does not invoke the Kansas criminal law definition, but rather the term should be given its common and everyday usage, similar to terms in a contract. Good Samaritan defines "theft" as "the act or instance of stealing" and "stealing" as "to take [the property of another] without right or permission" or "to get or accomplish secretly or artfully." See Webster's II New Riverside University Dictionary 1199, 1134 (1984).

Good Samaritan argues that Gassmann's deposition demonstrates that she took and copied the tape without permission and put it back without anyone discovering she had taken it. Within the definitions used by Good Samaritan, it argues Gassmann clearly acted secretly and artfully. Good Samaritan believes it has dem-

onstrated there is no factual dispute that Gassmann stole the tape in an effort to get the facility director fired.

Good Samaritan also argues that Gassmann's theft of property would have justified terminating her employment. Good Samaritan relies on what it believes to be evidence that Gassmann artfully slipped into the director's office to get the videotape and secretly took the videotape home, copied it, and returned it without anyone knowing. Good Samaritan contends that Gassmann must have been aware that her actions violated some company rule; otherwise, she would not have been so sneaky, secretive, and deceitful. Good Samaritan dismisses Keenan's affidavit as irrelevant. Citing the provisions in the employee handbook concerning theft from the facility, Good Samaritan submits it would have been legally and objectively justified in terminating Gassmann after learning of her theft.

This issue presents a factual question. Considering the principle of summary judgment that the district court must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom a summary judgment ruling is sought, we cannot find that this case is ripe for summary judgment. Nor can we say there is no genuine issue as to any material fact of whether Gassmann's actions constituted theft. Gassmann's affidavit and Keenan's supporting affidavit provide a sufficient inference to preclude summary judgment. Both Gassmann and Keenan stated it was company policy to watch the videotapes. We also note the definition of "theft" has not been adequately resolved. Simply proposing one definition over another does not resolve the question. This is a term whose definition must be factually resolved.

Because we find the record insufficient to dispose of Gassman's claim, we find it necessary to remand the cause to the district court for further proceedings.

Gassmann also claims two other reasons prevented summary judgment. She argues her allegations of the existence of an implied contract and failure to breach the implied contract created disputed issues of material fact and thus precluded summary judgment. However, Gassmann did not present any evidence in support of an implied contract in her motion opposing summary judgment,

nor does she in her brief on appeal. Good Samaritan did not address these issues on appeal.

We find the existence of an implied contract to be immaterial to a determination of whether summary judgment is appropriate on the issue of after-acquired evidence.

"'[A]n issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A feigned or imaginary issue is not a genuine issue. A disputed question of fact which is immaterial to the issues does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact.' [Citation omitted.]" *Seabourn v. Coronado Area Council, B.S.A.*, 257 Kan. 178, 189, 891 P.2d 385 (1995).

Whether Gassmann's employment was at will or under an implied-in-fact contract, the existence of after-acquired evidence, if properly established, would provide a reason to terminate for cause even in the implied-in-fact contract situation. Therefore, the existence of an implied-in-fact contract has no bearing on the issues raised to this court. In any event, Gassmann has not provided sufficient evidence which would preclude summary judgment in favor of dismissing a claim of an implied-in-fact contract.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinon.